**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) |
| | ) **CRIMINAL NO. 15-00102-CG-B** |
| **DSD SHIPPING, A.S.,** | ) |
| **DANIEL PAUL DANCU,** | ) |
| **BO GAO,** | ) |
| **XIAOBING CHEN, and** | ) |
| **XIN DHONG** | ) |
| | |
| **Defendant** | |

## <u>ORDER</u>

This matter is before the Court on the motion to suppress filed by

Defendant DSD Shipping, AS ("DSD Shipping") (Doc. 63) and the response

filed by the United States (Doc. 104). DSD Shipping requests suppression of

two categories of seized evidence: (1) evidence obtained during the

warrantless inspection of the *M/T Stavanger Blossom*, and (2) materials from

mirror images of three hard drives seized pursuant to a warrant. Three other

Defendants, Daniel Paul Dancu (Doc. 85), Xiaobing Chen (Doc. 66) and Xin

Dhong (Doc. 70), filed motions to adopt the motion to suppress. The Court

granted the motions to adopt as to Dancu (Doc. 88), Chen (Doc. 79), and

Dhong (Doc. 80). For the reasons stated herein, Defendants' motion to

suppress is due to be **DENIED.**

## I.   BACKGROUND

On April 30, 2015, a grand jury returned a seven-count indictment

(Doc. 1) against DSD Shipping Co., AS; Daniel Paul Dancu; Bo Gao; Xiaobing Chen; and Xin Zhong.[1] The indictment charges defendants with various offenses relating to the alleged failure to maintain, or intentional falsification of, the required Oil Record Book (the "ORB") on the Vessel, and obstruction of the Coast Guard's investigation of unlawful discharges of oily mixtures.

On November 8, 2014, the U.S. Coast Guard received an email from a crewmember onboard the *M/T Stavanger Blossom* alleging that the crew installed a bypass pipe on the vessel. (Doc. 63, Exh. 1). The bypass pipe, known as a "magic pipe," allegedly allowed oily-water from the vessel's bilge tank to bypass the Oily-Water Separator (OWS) and discharge overboard.[2] Id. The crewmember, identified as Rolando Babon, wrote that the Second Engineer ordered the crew to clean the sludge tank and place the oily waste in plastic bags. Babon stated the crew collected at least 90 bags and subsequently threw the bags overboard. Id.

On or about November 12, 2014, the *M/T Stavanger Blossom* docked at the Plains Terminal in Mobile, Alabama, a port within the jurisdiction of the Southern District of Alabama. (Doc. 63, Exh. 2, p. 1). Around 7:30 am, the

---

[1] DSD Shipping, headquartered in Norway and Singapore, operates a fleet of oil tankers, including the *M/T Stavanger Blossom*. (Doc. 63, p. 2).

[2] " "Bilge water" is the mixture of oil and water that accumulates in the "bilge"—or bottom—of a ship. All of the oil, fuel and other liquids that drip or leak from machinery during the ship's normal operation, and any seawater that leaks into the ship, ultimately flow downward into the bilge. A ship must periodically discharge that bilge water so that it does not rise to a level where it endangers the safety of the vessel and its crew." United States v. Pena, 684 F.3d 1137, 1142 (11th Cir. 2012).

U.S. Coast Guard boarded the vessel without a warrant and went to the ship's office.[3] Id. At the ship's office, the Coast Guard met the ship's master Laurentiu Florea and Chief Engineer, Defendant Daniel Paul Dancu ("Dancu"). Id. The Coast Guard informed the two men of the reason for the visit and stated that the Coast Guard would need to access the vessel's log equipment and the crew during the exam. Id.

Coast Guard officers met with Dancu and reviewed the ship's Oil Record Book (ORB). (Doc. 63, Exh. 2) In the initial inspection of the ORB, officers found no entries recording any direct discharges of oily-water or waste oil overboard without first being processed through the OWS. Id. As officers reviewed the records, Dancu explained that Defendant Xin Zhong, the ship's fourth engineer, obtained soundings of the vessel's tanks and entered them into an electronic "Daily Sounding Log" on the vessel's computer.[4] Id. Dancu printed the vessel's Daily Sounding Log for August 2014 through November 2014 and provided it to the officers. Dancu further explained that he reviewed the electronic logs and then recorded tank measurements in the ORB. Id.

While the Coast Guard officers reviewed the ORB, a second team of Coast Guard officers examined the vessel's machinery in the Engine Room.

---

[3] Port State Control examinations are specifically authorized by 33 C.F.R. § 153.23(a)(3), which allows the Coast Guard to search a vessel.

[4] "A 'sounding' is a measurement of the fluid level in a given tank or compartment." United States v. Fleet Mgmt., Ltd., No. CRIM.A. 07-279, 2009 WL 2581710, at *1 (E.D. Pa. Aug. 20, 2009).

(Doc. 63, Exh. 2, p. 1). Those officers began their engine room inspection at the ship's incinerator. Coast Guard Investigating Officer Shane Hunt reported that the area around the incinerator appeared clean and in good working order. (Doc. 63, Exh. 2, p.1). The ship's Fourth Assistant Engineer made several unsuccessful attempts to burn sludge, but the incinerator was not at the proper operating temperature of 800 degrees Fahrenheit. Id. While waiting for the incinerator to warm, the Coast Guard investigators turned to the ship's OWS system. Id. Investigator Hunt noticed that the discharge piping from the OWS had recently been painted, despite all other sections of the OWS piping being dirty and untouched. Id.

Shortly after their arrival on the vessel, the whistleblower, Babon, passed the Coast Guard investigators a flash drive containing photographs and video of the alleged oil dumping. (Doc. 63, Exh. 2, p. 2). Officers immediately reviewed the flash drive and found photos of the bypass pipe reported by Babon.[5] Id. The photos also showed the crew cleaning the vessel's Fuel Oil Sludge Tank, and numerous full plastic bags sitting outside the tank. Id. The flash drive also contained a video of the tank's cleaning process and the ship's radar showing latitude and longitude. Id. After viewing the video, Investigator Hunt ordered LTJG Langston and CWO Rushton to return to the engine room to attempt to locate the "magic pipe." Id.

As other officers searched for the removed pipe, Coast Guard officers

---

[5] For the purposes of this order, the terms "magic pipe" and "bypass pipe" are used interchangeably.

interviewed crewmembers regarding the "magic pipe" and discharges of oil.
Id. Beginning alphabetically, the Coast Guard first interviewed the
whistleblower, Rolando Babon. Id.

Babon confirmed that he emailed the Coast Guard prior to the vessel's
arrival in Mobile. Babon explained that the crew previously installed a
bypass pipe on the OWS piping and connected the pipe to the vessel's
overboard discharge valve. Id. According to Babon, Defendant Xiaobing Chen
ordered him to fabricate a new discharge pipe and replace the bypass pipe
before the vessel came to the United States. Id. Babon stated that he removed
and replaced the bypass pipe as ordered, and placed the pipe in the vessel's
Central Stores. Id. Babon further explained that Engine Room crewmembers
cleaned out the Fuel Oil Sludge Tank before arriving in the Port of Mobile.
Babon stated that the crew filled plastic bags with sludge and threw the bags
overboard in the Gulf of Mexico. Id. The Coast Guard also interviewed
crewmember Keith Enong, who confirmed that he observed crewmembers
throwing plastic bags of sludge overboard. (Doc. 63, Exh. 2, p.3).

With information from Babon, Coast Guard officers returned to the
engine room and found the bypass pipe in a storage closet. Id. Officers
observed that the pipe appeared to have oil residue inside. Id. The officers dry
fit the bypass pipe to the OWS piping and found it fit. Id. Coast Guard
officers also obtained oil samples from the Engine Room storage tanks,
including a sample from inside the bypass pipe and a sample from inside the

overboard discharge valve.[6] Id. The officers sampled this valve and found a black liquid substance inside. Id.

After securing evidence in their vehicle, the Coast Guard re-boarded the *M/T Stavanger Blossom*. (Doc. 63, Exh. 2, p.5). With assistance from the vessel's crewmembers, the Coast Guard removed the overboard discharge valve, disassembled it, and took samples from inside the valve. Id. Subsequent testing of the samples confirmed that the substance observed in the bypass pipe and overboard discharge valve was oil. Id.

Officers also compared the vessel's ORB to the rough sounding logs found in the engine room and the Daily Sounding Logs provided by Dancu. Id. An initial inspection of the records found the rough logs and Daily Sounding Logs to be consistent. Id. However, both logs were inconsistent with the ORB. Coast Guard officers also stated they found incorrect entries for the Bilge Tank, a tank that stores waste oil generated during vessel operations and water that collects in the bilge of the vessel. Id.

Prior to leaving the vessel, Coast Guard officers issued the vessel two detainable deficiencies for the inaccurate ORB and the bypass pipe. Officers also seized evidence of the violations, including: the computer from the chief engineer's office; the engine room control computer; the vessel's computer server; the ORB, Garbage Record Book, Engine Room alarm logs, and other log books and engine room documents; vessel and piping diagrams; the

---

[6] The overboard discharge valve connects to the exterior of the vessel and allows fluids to discharge from the vessel into the ocean.

bypass pipe; and the pipe installed to replace the bypass pipe. (Doc. 63, Exh. 6).

On November 13, 2014, Coast Guard officers returned to the vessel and installed the alleged bypass pipe between the three-way valve and the overboard discharge valve. (Doc. 63, Exh. 2, p. 5). The alleged bypass pipe fit into place. Id.

On November 14, 2014, agents from the Coast Guard and the Criminal Investigations Division for the United States Environmental Protection Agency ("EPA CID") retrieved materials collected by Investigator Hunt and Kira Moody during their boarding of the vessel. (Doc. 63, Exh. 7, p. 1).

On November 15, 2014, the Coast Guard forensically imaged the *M/T Stavanger Blossom*'s Vessel Bridge server, an HP Prolant with serial number CZ114500FD; a Compaq computer, with serial number CZC1970JZN from the Chief Engineer's stateroom; and an HP Compaq computer with serial number CZC1470JZN from the vessel's Engine Control Room. (Doc. 63, Exh. 8). The government then returned the computers to Defendant DSD Shipping. (Doc. 104, p. 7).

On November 25, 2014, United States Magistrate Judge Sonja F. Bivins issued a search warrant authorizing the search of the imaged hard drives. (case number MJ 14-00105-B; Doc. 63, Exh. 5). Under the heading of "identify the person or describe the property to be seized," the front of the warrant stated "see attached affidavit." Id. The warrant included an affidavit

with two attachments, Attachment A described the three hard drives that the

government requested to search and Attachment B included a description of

the information sought in the search. Id. Law enforcement officers

subsequently searched the imaged hard drives for specific items of evidence

as identified in the warrant. Id.

In its motion to suppress, Defendants' arguments center on

Attachment B, which states:

> Evidence, fruits, and instrumentalities of the commission of
> felony violations of 18 U.S.C. § 371 (Conspiracy), 33 U.S.C §
> 1908(a) (Knowing Failure to Maintain an Accurate Oil Record
> Book), 18 U.S.C. § 1519 (Falsification of Records), 18 U.S.C. §
> 1505 (Obstruction of Justice). 33 U.S.C. §§ 1321 (b)(3) and (5)
> (Discharges of Oil and Failure to Report Discharges of Oil), and
> 18 U.S.C. § 2 (Aiding and Abetting), including:
>
> 1. Records, notes, ledgers, documents, and data contained and
>    stored in computer memory on the mirror images of
>    computers from the M/T STAVANGER BLOSSOM (described
>    more particularly in Attachment A and the above paragraphs
>    of this attachment) pertaining to: vessel speed, progress,
>    schedule; compliance with environmental requirements;
>    maintenance and operation of the oily water separator; waste
>    oil management, storage and disposal; the contents, levels of,
>    and volumes contained within storage tanks on board the
>    vessel capable of containing oil (including but not limited to
>    records of daily or periodic "soundings" indicating levels or
>    volumes of liquids contained within the vessel's storage
>    tanks); pollution prevention requirements and equipment;
>    fuel oil management, composition, acquisition, storage and
>    consumption; engine condition, operation and maintenance;
>    engine room crew assignments and work schedules regarding
>    any of the subjects referred to in this paragraph; "diaries,"
>    logs, or records of work performed in the engine room or
>    engine department regarding any of the subjects referred to
>    in this paragraph; communications between crew members
>    regarding any of the subjects referred to in this paragraph;
>    communications between any crew member and any shore-

side company representative regarding any of the subjects referred to in this paragraph.

2. Evidence of user attribution showing who used or owned the computer at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history.

Exhibit 5 (Attachment B).

The Court now considers Defendants' motion to suppress. (Doc. 63).

## II.   ANALYSIS

The issue is whether the Coast Guard's search of the *M/T Stavanger Blossom* violated the Fourth Amendment. Defendants request suppression of two categories of seized evidence: (1) evidence obtained during the warrantless inspection of the *M/T Stavanger Blossom*, and (2) data from three hard drives seized pursuant to a warrant.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the exclusionary rule, evidence derived from a search that violates the Fourth Amendment cannot be used in a criminal trial against the victim of the illegal search and seizure. United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003).

### A. The Warrantless Vessel Search

The Supreme Court has stated, "the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise illegitimate." New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 742, 83

L.Ed.2d 720 (1985). "To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is 'prepared to recognize as legitimate.'" Id. (quoting Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). The requirement for a justifiable expectation of privacy is two-fold. United States v. Lopez, 761 F.2d 632, 635 (11th Cir. 1985). Defendants must show an actual or subjective expectation of privacy in the area searched and the expectation must be one that "society is prepared to recognize as 'reasonable.'" Hudson, 104 S.Ct. at 3199 (quoting Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

Privacy interests at sea may be more restrictive than those applicable on land. United States v. Thompson, 928 F.2d 1060, 1064 (11th Cir. 1991) ("At sea, a person's expectation of privacy may be severely restricted compared with expectations of privacy on land.") Often, privacy interests on vessels are limited because Coast Guard officers may board a vessel without permission to conduct a safety and document search as well as gain access to all common areas of a boat. Lopez, 761 F.2d at 635 ("It is not sufficient, for example, that a sailor have the right to exclude others from a ship in order to have a legitimate expectation of privacy, because a Coast Guard officer may board without permission to conduct a safety and document search and gain access to all common areas of a boat."); see also, United States v. Herrera, 711 F.2d 1546, 1553 (11th Cir. 1983).

Therefore, courts have held that "neither captain nor crew has a legitimate expectation of privacy ... in an area which is subject to the common access of those legitimately aboard the vessel." United States v. Freeman, 660 F.2d 1030, 1034 (5th Cir. Unit B 1981). Such common areas have been held to include cargo holds, United States v. Williams, 617 F.2d 1063 (5th Cir. 1980); ice holds, United States v. DeWeese, 632 F.2d 1267 (5th Cir. 1980); and engine rooms, United States v. Stuart-Caballero, 686 F.2d 890 (11th Cir. 1982), cert. denied, 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983). This does not mean, however, that a sailor lacks an expectation of privacy in any area of a ship; living and sleeping quarters of the crew, United States v. Whitmire, 595 F.2d 1303, 1312 (5th Cir. 1979), and private spaces such as dufflebags and footlockers, United States v. DeWeese, supra, 632 F.2d at 1271, have been held to be sufficiently private as to confer Fourth Amendment standing upon those with dominion over them when they are subjected to search.

In the instant case, the Coast Guard confined their search to the ship's office and the engine room, which are common areas. See e.g, Stuart-Caballero, supra, 686 F.2d at 892. Defendants argue that the Coast Guard had no authority to search the storage closet, where they found the alleged "magic pipe." The Court disagrees. Once on board, the Coast Guard has the authority to search all common areas of the ship. United States v. DeWeese, 632 F.2d 1267, 1270-71 (5th Cir. 1980), cert. denied, -- U.S. --, 102 S.Ct. 358,

70 L.Ed.2d 188 (1981). The storage closet, located in the vessel's Central

Stores is part of the common area of the vessel. In similar cases, the Eleventh

Circuit upheld searches of non-personal compartments. See e.g., United

States v. Thompson, 928 F.2d 1060, 1065-66 (11th Cir. 1991) ("The storage

compartment searched is unlike a personal knapsack or duffel bag. The

storage compartment, while below the v-berth mattress, is primarily used to

hold the boat's equipment, not personal items."); United States v. Stuart-

Caballero, 686 F.2d 890, 892 (11th Cir. 1982) (warrantless search of the

engine room and two forward cargo holds constitutional). Therefore, because

the Defendants had no expectation of privacy in the storage closet, they lack

standing to bring a Fourth Amendment challenge.

Furthermore, even if the foregoing analysis is incorrect and

Defendants have standing to raise a Fourth Amendment claim, the search

was consistent with constitutional standards.

Title 14 U.S.C.A. § 89(a) grants Coast Guard officers broad authority to

make safety and document inspections without suspicion of criminal

activity.[7] United States v. Williams, 617 F.2d 1063, 1086 (5th Cir. 1980) (en

---

[7] In its relevant part, the statute states:

> The Coast Guard may make inquiries, examinations,
> inspections, searches, seizures, and arrests upon the high seas
> and waters over which the United States has jurisdiction, for the
> prevention, detection, and suppression of violations of laws of
> the United States, For such purposes, commissioned, warrant,
> and petty officers may at any time go on board of any vessel
> subject to the jurisdiction, or to the operation of any law, of the

*banc*); United States v. Odom, 526 F.2d 339 (5th Cir. 1976). Once on board a vessel, a limited search is permissible on a reasonable suspicion of criminal activity. Lopez, 761 F.2d at 636 (citations omitted). Courts determine reasonable suspicion by considering the totality of the circumstances and evaluate whether there is reasonable suspicion based on specific and articulable facts which, taken together with rational inferences drawn from those facts, reasonably warrant suspicion of criminal activity. United States v. Roy, 869 F.2d 1427, 1430 (11th Cir. 1989) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975)).

A more expansive "stem to stern" vessel search requires the existence of probable cause that a crime has been, or is being, committed. Lopez, 761 F.2d at 636 (citations omitted). In general, courts determine whether probable cause existed by considering whether there were facts and circumstances known to law enforcement officials which could have warranted their reasonable belief that a crime had been or was being committed, United States v. Long, 674 F.2d 848 (11th Cir. 1982), or whether viewing such facts in their totality, together with the synthesis of what the

---

United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested ...

14 U.S.C. § 89(a).

agents collectively heard, knew and observed, all considered in light of the agents' individual experiences, there was the probability that criminal activity was afoot. <u>United States v. Agostino</u>, 608 F.2d 1035 (5th Cir. 1979).

In addition to § 89(a)'s broad grant of authority to enter a vessel, the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901 et seq. also provides the Coast Guard with specific authority to investigate potential oil pollution. The APPS makes it a crime for any person to knowingly violate the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 ("MARPOL"). The United States Coast Guard is specifically authorized to examine a vessel and its Oil and Garbage Record Books for compliance with MARPOL and APPS. 33 U.S.C. §1907(d); 33 C.F.R. § 151.23(a)(3) and (c); MARPOL Protocol, Annex V, Regulation 9(5); and 33 C.F.R. § 151.61(a) and (c).

In this case, the Coast Guard received information from a whistleblower concerning possible violations of MARPOL. When the *M/T Stavanger Blossom* arrived at port in Mobile, the Coast Guard boarded to investigate. After reviewing the ORB, the Coast Guard personnel visited the engine room, where they noticed a section of piping around the OWS that had been freshly painted. A crewmember and whistleblower, Rolando Babon, then gave the Coast Guard a flash drive of photographs and video of the alleged oil dumping. Another crewmember, Enong, confirmed that he too saw the crew collect plastic bags of sludge and cast the bags overboard. Armed with both

14

the information of the recently painted area near the OWS and that provided by two crewmembers, the Coast Guard personnel interviewed the engine room staff regarding the questionable activity. Under these circumstances, it is evident that the Coast Guard had probable cause to conduct a stem to stern search of the *M/T Stavanger Blossom*.

In their motion, Defendants suggest that the Supreme Court's recent holding in <u>City of Los Angeles v. Patel</u>, 576 U.S. ___, 135 S. Ct. 2443, 2446 (2015), alters the Coast Guard's ability to board and search a vessel for evidence of marine pollution. In particular, Defendants argue that because the Coast Guard's motive was a criminal investigation that it needed warrant to enter the vessel and that Defendants were entitled to a pre-compliance review. The Court rejects both of these assertions.

First, an ulterior motive for entering a vessel does not strip the Coast Guard of its broad statutory authority to board a vessel. In <u>United States v. Villamonte–Marquez</u>, the Supreme Court held that an otherwise valid warrantless boarding of a vessel by customs officials was not rendered invalid "because the customs officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marihuana." 462 U.S. 579, 584, n. 3, 103 S.Ct. 2573, 2577, n. 3, 77 L.Ed.2d 22 (1983). In <u>Whren v. United States</u>, the Supreme Court recognized that in <u>Villamonte-Marquez</u>, "[w]e flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal

justification." 517 U.S. 806, 812, 116 S.Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996).

Second, as to pre-compliance review, Defendants suggest that the Supreme Court's recent holding in <u>City of Los Angeles v. Patel</u> renders the Coast Guard's warrantless search unconstitutional. <u>City of Los Angeles, Calif. v. Patel</u>, 135 S. Ct. 2443, 2446 (2015). In its extensive argument concerning <u>Patel</u>, Defendants skim over a critical difference between their situation and that of the hoteliers in <u>Patel</u>. That difference is hotels are in a fixed location, ocean-going vessels are not. An ocean-going vessel could leave at any moment and these exigent circumstances make the search categorically different from <u>Patel</u>. <u>See</u> <u>U.S. v. Freeman</u>, 579 F.2d 942, 947 (5th Cir. 1978) (stating "there is a substantial distinction between a landlocked vehicle and a nautical vessel for Fourth Amendment purposes.") There is a long-held recognition of the differences between the necessity of the Coast Guard to make warrantless examinations of vessels. <u>See</u> <u>U.S. v. Williams</u>, 617 F.2d 1063 (5th Cir. 1980) (discussing the 200 year history of the necessity for officials to conduct searches of vessels). Defendants also argue that unlike the vessel in <u>Villamonte-Marquez</u>, a case where the Supreme Court found a Coast Guard search of a vessel 20 miles off shore constitutional, the *M/T Stavanger Blossom* had set anchor in the Port of Mobile. (Doc. 63, p. 12 – 13). In this case there are exigent circumstances. "[I]t is well established that "exigent circumstances," including the need to

prevent the destruction of evidence, permit police officers to conduct an otherwise permissible search without first obtaining a warrant." Kentucky v. King, 131 S. Ct. 1849, 1853-54, 179 L. Ed. 2d 865 (2011). Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, the Supreme Court has inferred that a warrant must generally be secured. A basic principle of Fourth Amendment law is " 'that searches and seizures inside a home without a warrant are presumptively unreasonable.' " Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (quoting Groh v. Ramirez, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004)). However, the Supreme Court also recognizes that this presumption may be overcome in some circumstances because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' " Brigham City, supra, at 403, 126 S.Ct. 1943; see also Michigan v. Fisher, 558 U.S. 45, 46, 130 S.Ct. 546, 548, 175 L.Ed.2d 410 (2009)  (per curiam). One well-recognized exception applies when " 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); see also Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant"). What is relevant in this case is the exigency "to prevent the

imminent destruction of evidence" has long been recognized as a sufficient justification for a warrantless search. Brigham City, supra, at 403, 126 S.Ct. 1943; see also Georgia v. Randolph, 547 U.S. 103, 116, n. 6, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006); Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). A pre-compliance review period in this case might have allowed time for the destruction of evidence.

Notably, the old Fifth Circuit stated that it was not even necessary for exigent circumstances to exist for a Coast Guard search: "the practical problems that would be created by requiring the Coast Guard to obtain a warrant to conduct a search on the high seas … or by requiring the Government to litigate the issue of "exigent circumstances" in every case where there is a warrantless search will likely eviscerate the Coast Guard's ability to combat drug smuggling." U.S. v. Williams, 617 F.2d 1063, 1087 (5th Cir. 1980)[8]. Rather, that court adopted the aforementioned "reasonable suspicion" as the appropriate Fourth Amendment standard by which to judge section 89(a) searches of the "private" areas of a vessel. Id. at 1088. As mentioned, the Court found probable cause for the search, which exceeds the minimum standard required by the law. Thus, without any persuasive argument to the contrary, the Court disagrees with Defendants' suggestion that the Patel holding alters the Coast Guard's ability to conduct warrantless

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

safety inspections of vessels.

### B. The Warrant

Defendants also attack the validity of the warrant used to search and seize data from the hard drives of the *M/T Stavanger Blossom*'s Vessel Bridge server; a Compaq computer, from the Chief Engineer's stateroom; and an HP Compaq computer from the vessel's Engine Control Room. Defendants argue that the warrant was neither sufficiently particular nor carried out in a reasonable manner.

The Fourth Amendment requires that every warrant particularly describe two things: "the place to be searched" and the "persons or things to be seized." U.S. Const. amend. IV.

First, a warrant must describe the things to be seized with sufficient particularity so that the precise language informs officers how to separate properly seized items from irrelevant items. Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927). However, "elaborate specificity is unnecessary." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984). "The description is considered sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." Id. at 754–55 (citation and internal quotation marks omitted). This requirement does not necessitate technical perfection; instead, it is applied with "a practical margin of flexibility." United States v. Bradley,

644 F.3d 1213, 1259 (11th Cir. 2011)(quoting United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982)). Second, the description of the things to be seized should be limited to the scope of probable cause established in the warrant. Together, these elements forbid agents from obtaining general warrants. A general order to search through a person's belongings is not permissible under the Fourth Amendment. See Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971) (A warrant is impermissibly overbroad if it authorizes "a general, exploratory rummaging in a person's belongings.") Instead, a warrant requires agents to conduct narrow seizures that attempt to "minimize[] unwarranted intrusions upon privacy." Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976).

Where, as here, the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance. Not only does a computer contain a vast storage capability far exceeding any office file cabinet, but also an individual's interaction with the computer may extend to all areas of their private life. United States v. Carey, 172 F.3d 1268, 1275 (10th Cir. 1999)("Relying on analogies to closed containers or file cabinets may lead courts to 'oversimplify a complex area of Fourth Amendment doctrines and ignore the realities of massive modern computer storage.' ") (internal citations omitted). As a result, technology presents unique challenges in the application of the Fourth Amendment. With warrants for digital searches, there is a difficult balancing act of the warrant being

sufficiently particular, while also recognizing that the contents of most files will not be revealed until opened and thus, searched.

In this case, Defendants make three arguments on why the warrant is insufficiently particular. First, Defendants argue that Attachment B of the warrant failed to include temporal restrictions and thus, renders the entire warrant invalid. (Doc. 63). Defendants claim that "relevant dates are available, the search warrant must include temporal restrictions." (Doc. 63, p. 17). However, Defendants cite no binding precedent to support the assertion that temporal restrictions are a mandatory requirement of a digital search.[9]

---

[9] Defendants cite four cases in support of their contention that a temporal restriction is a mandatory element of a data search. First, Defendants cite United States v. Ford, 184 F.3d 566, 576 (6th Cir. 1999), which states, "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad."). The Ford case involved the raid of a bingo hall where officers seized paperwork from back the mid-80s before the bingo hall owner purchased the business. Second, Defendants cite United States v. Kow, 58 F.3d 423, 427 (9th Cir. 1995), where a warrant authorized the wholesale seizure of all computers, including all data, with no parameters whatsoever. Such is not the case here. Third, Defendants cite United States v. Maali, 346 F. Supp. 2d 1226, 1243, wherein the District Court found that the warrants sufficiently particular for containing a time frame for the data collected. However, at no point does the holding state outright that a temporal restriction is a mandatory element, but rather the time frame as a factor amongst several reasons. Finally, Defendants cite In re Search of 3817 W. West End, First Floor Chicago, Illinois 60621, 321 F. Supp. 2d 953, 959 (N.D. Ill. 2004), which states "[c]omputer technology affords a variety of methods by which the government may tailor a search to target on the documents which evidence the alleged criminal activity. These methods **include** limiting the search by date range; doing key word searches; limiting the search to text or files or graphic files; and focusing on certain software programs." (emphasis added). Again, a temporal restriction appears to be an element of determining particularity of data seized, but the case law cited does not indicate temporal restrictions are mandatory requirements.

Rather, from the cases cited in Defendants' motion, courts consider the totality of the circumstances and in some cases, find that a temporal restriction is part of a series of factors considered rather than a threshold requirement.

Furthermore, the affidavit specifically referenced September to November 2014 as the period in which the alleged violations of federal law occurred. Warrants may satisfy the requirements of the Fourth Amendment through incorporation. United States v. Wuagneux, 683 F.2d 1343, 1351 n.6 (11th Cir.1982) (finding "We conclude the affidavit may be used to explain an ambiguity in the terms of the warrant."); see also, United States v. Weinstein, 762 F.2d 1522, 1531 (11th Cir. 1985) ("An affidavit incorporated into a warrant by express reference and attached to and accompanying the warrant can cure ambiguity in the warrant itself.") As set forth in United States v. Curry, suitable words of reference incorporating [an] affidavit" are phrases such as "see attached affidavit" or "as described in the affidavit." 911 F.2d 72, 77 (8th Cir. 1990) (internal quotes omitted); accord United States v. Tracey, 597 F .3d 140, 147–48 (3rd Cir. 2010) (incorporation must be "clear," using phrases such as "see Exhibit A sealed by Order of the Court" or "specified in the annexed affidavit") (internal quotes omitted). In this case, under the heading of "identify the person or describe the property to be seized," the warrant clearly states, "see attached affidavit." (Doc. 63, Exh. 5). The Court concludes that this warrant was sufficiently incorporated by

reference and the affidavit does include a temporal restriction for alleged violations of federal law.

In Attachment B, paragraph 2 the Court finds a second temporal restriction. Attachment B, paragraph 2, lists the additional items to be searched as "[e]vidence of user attribution showing who used or owned the computer **at the time the things described in this warrant** were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history." (Doc. 63, Exh. 5) (emphasis added). Defendants argue that this paragraph contained no parameters for the search. Yet, paragraph 2's language states, "at the time the things in this warrant were created…" While this parameter does not include an explicit date, it does provide a temporal restriction when viewed in context of the warrant. Thus, the Court disagrees with Defendants contention that the warrant is presumptively invalid for lack of a temporal restriction.

Second, Defendants claims the warrant lacked parameters on the items and individuals to be searched and authorized only the collection of general categories. The Court disagrees. Here, the exhaustive list contained in Attachment B paragraph 1 is as particular as feasible under these circumstances. Further, the long-held rule in this Circuit is "the particularity requirement must be applied with a practical margin of flexibility, depending on the type property to be seized, and that description of property will be acceptable if it is as specific as the circumstances and nature of activity under

investigation permit." <u>United States v. Wuagneux</u>, 683 F.2d. 1343, 1349 (11th

Cir. 1982). All of the data requested directly relates to the crimes charged in

the indictment surrounding alleged oil dumping and failure to maintain an

accurate Oil Record Book. The warrant language is as particular as possible

under the circumstances without having reviewed the files.

Defendants also argue Attachment B, paragraph 2, lacked parameters

concerning "the description of the items to be searched lacks identification of

the individuals being investigated and provides no means to distinguish data

and information relevant to the investigation from personal data and

information pertaining to the various members of the crew." (Doc. 63, p. 18).

Attachment B, paragraph 2 lists the additional items to be searched as

"[e]vidence of user attribution showing who used or owned the computer **at

the time the things described in this warrant** were created, edited, or

deleted, such as logs, phonebooks, saved usernames and passwords,

documents, and browsing history." (Doc. 63, Exh. 5) (emphasis added). The

Court disagrees with Defendants' argument as the language clearly

references back to the warrant as a whole. The language of "at the time the

things in this warrant were created…" relies on the descriptions contained

within the warrant and is not a parameter-less search as Defendants aver.

Finally, Defendants argue that the warrant cites statutes too broad to

provide any limitation. In support of this argument, Defendants cite an

Eighth Circuit case that found 18 U.S.C. § 371 as "too broad in scope to

provide any real limitation on the warrant." Rickert v. Sweeney, 813 F.2d 907, 908-09 (8th Cir. 1987). However, there are critical differences between the present case and Rickert. In Rickert, the warrant at issue cited only general statutes, the general conspiracy statute, 18 U.S.C. § 371, and two general tax evasion statutes, 26 U.S.C. §§ 7201 and 7206(2). Rickert v. Sweeney, 813 F.2d 907, 909 (8th Cir. 1987). Additionally, Rickert warrant failed to incorporate the affidavit. Left only with overly broad statutory authority, the Eighth Circuit rendered the search warrant invalid. Id.

Here, however, the warrant properly incorporated the affidavit. Attachment B cited a multitude of statutes relating to the falsification of records, failure to maintain and accurate record book and discharge of oil and failure to report discharges of oil. Section 371 is hardly the only statute authorizing the search of the computers and the properly incorporated affidavit contained specific limitations on the search. Thus, the Court is not persuaded that the warrant was overly broad.

Even if the foregoing analysis is incorrect, the evidence seized from the hard drives would be admissible under the good faith exception to the exclusionary rule. Under the exclusionary rule, "evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution." United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002) (citing United States v. Calandra, 414 U.S. 338, 348 (1974)). The good faith exception to the exclusionary rule allows admission of evidence

obtained by police acting in reasonable reliance upon a search warrant.

United States v. Leon, 468 U.S. 897 (1984).  In the ordinary case, an officer

cannot be expected to question the judge's probable-cause determination or

his judgment that the form of the warrant is technically sufficient. "[O]nce

the warrant issues, there is literally nothing more the policeman can do in

seeking to comply with the law." Stone v. Powell, 428 U.S. 465, 498 (1976)

(Burger, C. J., concurring). The good faith exception applies in all but four

circumstances:

> (1) the magistrate or judge in issuing a warrant was misled by
> information in an affidavit that the affiant knew was false or
> would have known was false except for his reckless disregard
> of the truth; (2) where the issuing magistrate wholly
> abandoned his judicial role . . . ; (3) where the affidavit
> supporting the warrant is so lacking in indicia of probable
> cause as to render official belief in its existence entirely
> unreasonable; and (4) where, depending upon the
> circumstances of the particular case, a warrant is so facially
> deficient—i.e., in failing to particularize the place to be
> searched or the things to be seized—that the executing
> officers cannot reasonably presume it to be valid.

United States v. Cruse, 343 F. App'x 462, 464 (11th Cir. 2009)(citing Martin,

297 F.3d at 1313).

Here, none of the circumstances discussed in Leon are present to

negate the good-faith exception. Based on the record, there is no evidence the

affidavit in support of the warrant contained false information. Further,

there is nothing indicating that the magistrate judge failed to act in a neutral

and detached manner.

As mentioned, the Court found probable cause arising from a

combination of the information provided by a whistleblower, the recently repainted sections of the OWS system, and discrepancies between the ORB and the sounding logs. (Doc. 63, Exh. 5). Finally, there is no compelling evidence whatsoever that the warrant is so facially deficient that an executing officer could not reasonably presume the warrant to be valid. The warrant at issue incorporated the affidavit, which included an extensive attestation to the circumstances surrounding the search. Additionally, the two attachments also contained a particularized list of data sought in relation to the alleged MARPOL violations. Therefore, the good faith exception to the exclusionary rule would apply to this information as well.

As a result of the foregoing analysis, Defendants' motion to suppress (Doc. 63) is **DENIED.**

**DONE and ORDERED** this 2nd day of September, 2015.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE