IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 15-00102-CG-B |
| DSD SHIPPING, A.S., | ) | |
| DANIEL PAUL DANCU, | ) | |
| BO GAO, | ) | |
| XIAOBING CHEN, and | ) | |
| XIN ZHONG | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on DSD Shipping, A.S.'s motion to dismiss certain counts of the indictment and to compel an election of certain multiplicitous counts (Doc. 131) and the United States' response (Doc. 145). Three other Defendants, Xiobing Chen (Doc. 132), Xin Zhong (Doc. 136), and Daniel Paul Dancu (Doc. 140), filed motions to adopt the motion to dismiss. The Court granted the motions to adopt as to Xiabong Chen and Xin Zhong (Doc. 139) and Daniel Paul Dancu (Doc. 141).[1]  For the reasons stated herein, Defendants' motion is due to be **DENIED**.

I.     BACKGROUND

On November 3, 2014 and November 12, 2014, the *M/T Stavanger Blossom* docked at the Port of Lake Charles, Louisiana and the Plains

---

[1] DSD Shipping, A.S., Xiobing Chen, Xin Zhong, and Daniel Paul Dancu are hereinafter collectively referred to as "Defendants."

Terminal in Mobile, Alabama, respectively. (Doc. 145, p. 2). The *M/T Stavanger Blossom* is a 56,172 gross ton ocean-going oil tanker sailing under the flag of Singapore. Id. DSD Shipping, A.S. owns the *M/T Stavanger Blossom*. Id. At both stops Defendants made available their Oil and Garbage Record Books to the Coast Guard. Id.

Based on information received from a crewmember, the Mobile division of the Coast Guard found it necessary to investigate undocumented oil-contaminated bilge water and plastic discharge of the *M/T Stavanger Blossom*. The alleged discharges were reported to have occurred while the *M/T Stavanger Blossom* was on the high seas. The Coast Guard found no entries recording any direct discharges of oily-water in the Oil Record Book. Id. Instead, the Coast Guard found that the Chief Engineer and Fourth Engineer recorded in the Oil Record Book that the vessel discharged bilge waste using the proper pollution control device. Also, the Coast Guard found no entries regarding plastic discharge on the high seas in the Garbage Record Book. Id. The Coast Guard uncovered further evidence alleging that senior engine department officers obstructed the Coast Guard's investigation by urging subordinate crewmembers to withhold information and lie to Coast Guard inspectors. Id.

Based upon the Oil and Garbage Record Books, investigation, and crew interviews, the Coast Guard issued two detainable deficiencies for inaccurate Oil and Garbage Record Books and routinely discharging large quantities of

untreated oil-contaminated bilge wastes directly into the ocean.

On April 30, 2015, a federal grand jury returned a seven-count indictment (hereinafter, the "Alabama Indictment") against Defendants. (Doc. 1). The Alabama Indictment includes charges of conspiracy (18 U.S.C. § 371), the knowing failure to maintain an accurate Oil Record Book and Garbage Record Book (33 U.S.C. § 1908(a)), obstruction of justice (18 U.S.C. §§ 1505 and 1519), and witness tampering (18 U.S.C. § 1512(b)). Subsequently, on June 11, 2015, a federal grand jury for the Western District of Louisiana returned a three-count indictment (hereinafter, "Louisiana Indictment") against Defendants, which includes charges of the knowing failure to maintain an accurate Oil Record Book (33 U.S.C. § 1908(a)), obstruction of justice (18 U.S.C. §§ 1505 and 1519), and aiding and abetting (18 U.S.C. § 2). (C.N. 15-cr-179-CB-B, Doc. 1, Exh. 2).

In the present motion, Defendants raise three arguments. (Doc. 131). First, Defendants argue that both indictments fail to state a violation upon which the United States can prosecute because the alleged discharges and failure to document took place on the high seas. Id. at 10. Second, Defendants argue that certain counts within both indictments fail to provide adequate notice of essential facts necessary to prepare a defense. Id. at 27. Third, Defendants argue that, in the alternative, the Court should compel the United States to elect the charges it seeks to pursue due to multiplicity. Id. at 28. The Court disagrees with each argument and will address each in

turn.

## II.   THE ACT TO PREVENT POLLUTION FROM SHIPS

### A. Jurisdiction of the United States Under the Act to Prevent Pollution from Ships

A "district court [is] required to dismiss [an] indictment if it fails to allege facts that constitute a prosecutable offense." United States v. Cure, 804 F.2d 625, 627 (11th Cir. 1986). Thus, the issue is whether the United States has jurisdiction to prosecute either the alleged unauthorized discharge that occurred on the high seas or any attendant record book violations that occurred at that time, or whether the United States has jurisdiction to enforce its laws regarding the alleged false statements contained within the record books made available to the Coast Guard during Defendants' entries into the Port of Lake Charles, Louisiana and the Port of Mobile Alabama. Based on the following, the Court answers the later in the affirmative.

The 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships are two treaties generally referred to as "MARPOL." MARPOL's regulations are implemented under the Act to Prevent Pollution from Ships (hereinafter, the "APPS"), 33 U.S.C. §§ 1901 to 1905. The APPS makes acts in violation of MARPOL, the APPS, or "the regulations issued thereunder" unlawful. 33 U.S.C. § 1907(a). The APPS also provides criminal sanctions for knowing violations. 33 U.S.C. § 1908(a).

In order to police certain actions, the APPS requires that each vessel

4

maintain record books.  Two such record books are relevant to this case. First, the APPS states that "[e]ach oil tanker of 150 gross tons and above . . . shall maintain an Oil Record Book."  33 C.F.R. § 151.25(a).  A ship's crew is required to make entries into an Oil Record Book whenever there is disposal of oil residue, 33 C.F.R. § 151.25(d)(3), or "[d]ischarge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces," 33 C.F.R. § 151.25(d)(4).  Each event "shall be fully recorded without delay in the Oil Record Book . . . [and] signed by the person or persons in charge of the operations concerned."  33 C.F.R. § 151.25(h).  The Oil Record Book is to be maintained and kept so that it is "readily available for inspection."  33 C.F.R. § 151.25(j), (k).

Second, the APPS requires that each vessel maintain a written record of the garbage "[d]ischarge[d] into the sea."  33 C.F.R. § 151.55(a).  When garbage is discharged into the sea, the Garbage Record Book must indicate the date and time of the discharge, longitude and latitude of the ship, category of garbage involved, and estimated amount of garbage discharged. 33 C.F.R. § 151.55(d).  Recordation in the Garbage Record Book applies to plastics, operational wastes, and other specifically listed wastes a vessel may generate.  33 C.F.R. § 151.55(e).[2]

Defendants aver that when these provisions use the word "maintain,"

---

[2] The Oil Record Book and Garbage Record Book are two separate records to be maintained.  However, the rules and analysis for both are substantively the same.  Therefore, the term record book is used interchangeably and applies to both unless specified otherwise.

5

it merely recites "what types of vessels are required to keep Oil and Garbage Record Books." (Doc. 131, p. 16). Any substantive duties relating to the books are included later in the regulation. Id. at 19. In other words, Defendant advances the notion that physical possession is all that is required and accuracy of the entry is not a consideration in maintaining the required record book. (Doc. 148, p. 6) ("Properly understood, the word 'maintain' simply means to keep, and it is used merely to define what types of vessels must keep record books."). Additionally, Defendants argue that a record book violation is only completed upon failing to make an entry, which would bar prosecution by the United States if such an entry were required on the high seas. (Doc. 131, p. 15). Thus, the only option the United States would have in such a situation is to refer the matter to the flag state. Id. at 17. Such an interpretation ignores the most natural reading of the statute and strains credulity.

"In the context of a regulation imposing record-keeping requirements, the duty to 'maintain' plainly means a duty to 'maintain' a reasonably complete and accurate record." United States v. Ionia Mgmt. S.A., 555 F.3d 303, 309 (2d Cir. 2009) (emphasis in original). "[I]gnoring the duty to [accurately] maintain puts the regulation at odds with MARPOL and Congress' clear intent under the APPS to prevent pollution at sea according to MARPOL." United States v. Jho, 534 F.3d 398, 403 (5th Cir. 2008). "If the record books did not have to be [accurately] 'maintained' while in the ports or

6

navigable waters of the Unites States, then a foreign-flagged vessel could avoid application of the record book requirements simply by falsifying all of its record book information just before entry into a port or navigable waters." Id.

Thus, a violation of Section 151.25 or Section 151.55 of the APPS occurs when entry is made into United States waters with a fictitious record book made available for inspection and not when the pollution itself, or even the record book violation, occurs. See Id. at 404 ("[T]he 'gravamen' of the action was "not the pollution itself, or even the Oil Record Book violation occurring at that time, but the misrepresentation in port."); Ionia, 555 F.3d at 309 (holding that the APPS's requirement that ships "maintain" an Oil Record Book, 33 C.F.R. § 151.25, mandates that these ships "ensure that their ORBs are accurate (or at least not knowingly inaccurate) upon entering the ports or navigable waters of the United States"); see also United States v. Sanford, Ltd., 880 F. Supp. 2d 9, 19 (D.D.C. 2012) (holding the same); United States v. Petraia Mar., Ltd., 483 F. Supp. 2d 34, 39 (D. Me. 2007) (holding the same).

Although there are no Eleventh Circuit opinions directly on point, the Court finds the holding and reasoning of United States v. Royal Caribbean Cruises, Ltd., 11 F. Supp. 2d 1358 (S.D. Fla. 1998), persuasive. In Royal Caribbean, the United States indicted Royal Caribbean with violation of 18 U.S.C. § 1001 for making a false statement within an Oil Record Book

7

regarding an oil discharge that occurred on the high seas.  11 F. Supp. 2d at 1361.  Section 1001 makes it a crime to knowingly and willfully falsify, make any materially false representation, or make use of any false writing "knowing the same to contain any materially false" statements.  18 U.S.C. § 1001(a).

Like Defendants, Royal Caribbean argued that, because the duty to make entries under the APPS "occurs at the time of discharge, and the discharge" occurred on the high seas, jurisdiction was improper.  Id. at 1363.  Thus, Royal Caribbean argued that the United States could not prosecute it for making available within the waters of the United States fictitious entries made without the jurisdiction of the United States.  Id.  The court was not persuaded by this argument and held that "the fact that the alleged false statement . . . was not made within the jurisdictional bounds of the United States is not necessarily fatal to the claim," and that "even if the statement is arguably true at the time it was made in the location it was made, if the statement is false as a matter of United States law and fulfills the other requirements" of the crime charged, "it is actionable."  Id.  The court went on to hold that whether the United States could prosecute actions on the high seas had no bearing on whether the United States had "jurisdiction to enforce its laws [in a domestic port] regarding the commission of false statements made to a United States agency performing its regular and proper duties."  Id. at 1364.

Here, on or about November 3, 2014, the *M/T Stavanger Blossom* entered United States waters and made port in Lake Charles, Louisiana. While in port, Defendants made available to the Coast Guard their record books. On or about November 12, 2014, the *M/T Stavanger Blossom* made port in Mobile, Alabama. Again, Defendants again made available to the Coast Guard the same record books. In both instances, the Coast Guard was performing its regular and proper duties. Based on a crewmember's email and subsequent investigation, the Coast Guard uncovered evidence alleging that the crew failed to document exceptional discharges of oil-contaminated bilge waste, sludge disposal, and plastic discharge in the requisite record books. Nonetheless, Defendants record books indicated that no such action occurred.

The fact hat any discharge or disposal took place on the high seas is of no consequence. Defendants have not been indicted with the actual discharge or failure to document the entry at the time of discharge. What is of consequence, like in Royal Caribbean, is whether Defendants made entry into the waters of the United States with fictitious record books and made said record books available to the Coast Guard. Such a failure to maintain is tantamount to an action under 18 U.S.C. § 1001(a), and the desired effect by a perpetrator is the same—impairment of the Coast Guard's ability to conduct investigations and enforce violations of the APPS within a domestic port.

Thus, the Court holds that prosecutorial jurisdiction is proper in this matter. To find to the contrary would "raise serious questions about the government's ability to enforce, as a mater of domestic law, false statements made in connection with such matters as bank fraud, immigration, and visa cases, where false statements at issue were made outside of the United States" and declared within as truthful and accurate. Royal Caribbean, 11 F. Supp. 2d at 1364.

### B. Extraterritorial application of the Act to Prevent Pollution from Ships

Even if the above conclusion is wrong, there is an alternative basis for upholding jurisdiction for the indicted record book counts and obstruction of justice counts. "Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States." United States v. Plummer, 221 F.3d 1298, 1304 (11th Cir. 2000). "Federal criminal statutes may properly include extraterritorial effects." Id. (citing United States v. Baker, 609 F.2d 134, 136 (5th Cir.), reh'g denied, 613 F.2d 314 (1980)). Deciding whether Congress has applied a statute extraterritorially is a matter of statutory construction. Id. The Supreme Court articulated the analysis for deciding the extraterritorial application of a law in United States v. Bowman, 260 U.S. 94 (1922). Bowman stated, in relevant part:

> The necessary locus [of the crime], when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private

10

> individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard. But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

Id. at 97–98. The Eleventh Circuit has interpreted Bowman as establishing that the congressional intent for the extraterritorial application of a criminal statute can be inferred. Plummer, 221 F.3d at 1305. Such congressional intent has been routinely inferred when foreign offenses cause domestic harm. See United States v. MacAllister, 160 F.3d 1304, 1305 (11th Cir. 1998) (conspiracy to traffic cocaine from the United States to Canada); United States v. Benitez, 741 F.2d 1312, 1316–17 (11th Cir. 1984) (conspiracy to murder government agents and assault of government agents abroad); Petraia, 483 F. Supp. 2d at 38–39 (failure to maintain an accurate Oil Record

11

Book and intentional obstruction of the APPS). The extraterritorial doctrine has also been applied in the context of a foreign-flagged vessel's violation of domestic laws on the high seas. See United States v. Padilla-Martinez, 782 F.2d 942, 950 (11th Cir. 1985) (applying domestic law to a foreign-flagged vessel seized on the high seas); Petraia, 483 F. Supp. 2d at 38–39 (applying domestic law to a foreign-flagged vessel's failure to maintain an Oil Record Book and intentional attempts to obstruct the administration of law).

Defendants, however, argue that 33 U.S.C. § 1908 record book statutes as well as 18 U.S.C. §§ 1505 and 1519 obstruction statutes do not apply extraterritorially. (Doc. 131, pp. 21, 23); (Doc. 148, 9–13). Defendants contend Congress must "clearly express" an "affirmative intention" to overcome the presumption that a law does not extraterritorially apply and explains that "there is no hint, let alone an affirmative expression, in the text or legislative history that Congress intended" these statutes to apply extraterritorially. (Doc. 148, p. 10).[3] Defendants' argument fails to consider

---

[3] Defendants cite three Supreme Court cases in furtherance of their extraterritoriality position. (Doc. 131, pp. 21, 23–25) (citing E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244 (1991); Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010); and Arthur Andersen LLP v. United States, 544 U.S. 696 (2005) for the proposition that the extraterritoriality doctrine only applies when congressional intent is clearly expressed). The Court finds that these cases lend no help in today's decision for three reasons. First, Arabian Am. Oil and Morrison were both civil cases. The present case is criminal. Second, although Arthur Andersen LLP was a criminal case, the issue there was whether jury instructions failed to properly convey the elements of the crime charged. Arthur Andersen LLP did not deal with extraterritoriality at all. Third, none of these cases required the Court to consider the exception the Bowman case articulated for criminal cases, which is discussed herein.

the nature and domestic effect the criminal statutes in question target.

First, the failure to properly maintain a record book, 33 U.S.C § 1908(a), is not logically dependent upon the borders of the United States. Regardless of where the entry is made, the ultimate goal of the entry is for it to be considered by the Coast Guard and have effect in the United States. If fictitious and accepted, such an entry undermines not only the authority of the Coast Guard but the laws under which it operates.

Likewise, the obstruction statutes, 18 U.S.C. §§ 1505 and 1519, apply extraterritorially because such foreign offenses cause domestic harm and are not logically dependent on their locality. Obstruction of justice is not a crime against a "private individual or their property." See United States v. Vilar, 729 F.3d 62, 72 (2d Cir. 2013) (declining to apply Section 10(b) of the Securities and Exchange Act extraterritorially where the government is not harmed by the actions) (citing Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010)). Instead, the law in question is aimed at protecting "the right of the government to protect itself." Bowman, 260 U.S. at 98. If Defendants were not attempting to obstruct the execution United States laws at both ports, why else would Defendants allegedly direct the crew to disconnect the bypass pipe, install a new spool pipe, and paint the new pipe to hid its recent installation? It matters not if the actions in questions took place two miles off the United States' coast or two miles off Singapore's coast. The intentions would be the same: to make the Coast Guard none the wiser

as to Defendants' alleged attempts to subvert detection while conducting business within the United States' borders.  To limit the application of either statute creates the ability for perpetrators to operate with impunity and undermines the Coast Guard's ability to enforce the duty with which it is entrusted.  Such a result is surely not what Congress had in mind.

Finding the statutes in question apply extraterritorially, it is necessary to evaluate whether such application violates the general principles of international law.  MacAllister, 160 F.3d at 1308.  If the objective territorial principle of international law is satisfied, the extraterritorial application of a law does not violate general principles of international law.  Id.  "The objective territorial principle applies where the defendant's actions [ ] produced some effect in the United States."  Id.  In the present case, Defendants' actions were intended to usurp any investigation the Coast Guard conducted and take advantage of United States ports.  Defendants' alleged conduct causes domestic harm.  The Court concludes that the objective territorial approach permits extraterritorial application of the law.

Therefore, as an alternative basis, 33 U.S.C. § 1908 and 18 U.S.C. §§ 1505 and 1519 extraterritorially apply because the harm protected against has domestic effects, and the crimes do not depend their location for the offense to occur.

### III. SUFFICIENCY OF THE INDICTMENT

Defendants further aver that "Counts 1 through 5 of the Alabama

14

Indictment and Counts 1 through 3 of the Louisiana Indictment fail to provide" adequate notice of the essential facts necessary to their defense. (Doc. 131, p. 27).  More specifically, Defendants claim that the "charges fail to include basic facts about when [the] allegedly false entries and omissions were made over a three month timeframe—from August 5, until November 12, 2015." Id.

"An indictment is considered legally sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009).  "In determining whether an indictment is sufficient, we read it as a whole and give it a 'common sense construction.'" Id. (citing United States v. Gold, 743 F.2d 800, 813 (11th Cir. 1984) and United States v. Markham, 537 F.2d 187, 192 (5th Cir. 1976)).  "If the indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003) (internal quotations omitted).

Here, reading the indictment as a whole and giving it common sense construction, both the Alabama Indictment and the Louisiana Indictment

15

meet the required factual standard.  The Alabama Indictment lays out the legal framework regarding the entries to be made to an Oil Record Book and Garbage Record Book.  (Doc. 1, pp. 5–6).  Further, Counts Two and Three of the Alabama Indictment charge Defendants with failing to maintain records of overboard discharges in their record books on or about November 12, 2014 in the Port of Mobile, Alabama.  Id. at pp. 12–13.  Count One of the Louisiana Indictment significantly tracks the language of the Alabama Indictment but makes reference to November 3, 2014, the date Defendants made available the record books in the Port of Lake Charles Louisiana.  See Louisiana Indictment, pp. 8–9.

Such a statement of facts puts Defendants on notice of the exact dates in question, November 3, 2014 and November 12, 2014.  The fact that the indictment makes reference to the time period leading up to Defendants' presentment of the records does not, as Defendants argue, allow the government to "rely on any of hundreds of possible events that occurred during a three-month span." (Doc. 131, p. 28).  As discussed above, the only events in question are Defendants' entries into United States waters and Defendants' making available for inspection at each port their record books.  Therefore, the Court finds that the indictments provide Defendant with the facts necessary to prepare its defense.

## IV.  MULTIPLICITY

Last, Defendants ask that the Court order the United States to elect

among allegedly multiplicitous charges, then dismiss and strike the unelected charges. Id. In support, Defendants contend, "Counts 1, 2, and 3 of the Louisiana Indictment are substantively identical to the charges contained in Counts 2, 4, and 6, respectively, of the Alabama Indictment." The Court finds this argument unpersuasive.

"An indictment is multiplicitous if it charges a single offense in more than one count." U.S. v. Woods, 684 F.3d 1045, 1060 (11th Cir. 2012). A multiplicitous indictment "violates double jeopardy principles by giving the jury more than one opportunity to convict the defendant for the same offense." United States v. Jones, 601 F.3d 1247, 1258 (11th Cir. 2010). "To assess whether the two offenses charged separately in the indictment are really one offense charged twice, the 'same elements' test or the 'Blockburger' test is applied." United States v. Chacko, 169 F.3d 140, 146 (2d Cir. 1999). "[C]harges in an indictment are not multiplicitous if the charges differ by even a single element or alleged fact." Woods, 684 F.3d at 1060.

In the present case, the indictments are not multiplicitous because the two indictments contain alleged facts that are different. More specifically, Defendants entered two geographically distinct domestic ports. The Alabama Indictment charges Defendants with failing to maintain their record books and making such books available in the Port of Mobile, Alabama. The Louisiana Indictment charges Defendants with similar conduct but within the Port of Lake Charles, Louisiana. As noted above, the basis of the two

indictments is "not the pollution itself, or even the Oil Record Book violation occurring [in international waters], but the misrepresentation in port." Jho, 534 F.3d at 404 (internal quotation marks omitted).  Thus, Defendants' alleged acts are two different acts realized within two different jurisdictions.  This satisfies the Court that the counts in each indictment are unique and do not expose Defendants to multiplicitous counts.[4]

V.     CONCLUSION

Based on the foregoing, Defendants' motion to dismiss (Doc. 131) is hereby **DENIED**.

**DONE and ORDERED** this 15th day of September, 2015.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE

---

[4] Defendants' argument of continuing offenses (Doc. 138, p. 18) fails for the same reason.  The crux of the indictment is the entry into two unique ports and making available the fictitious entries in each record book and not simply the lingering effect of an earlier completed act.