IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| **DSD SHIPPING, A.S.,** | \* | 1:15-CR-00102-CG |
| **BO GAO,** | \* | |
| **XIAOBING CHEN, and** | \* | |
| **XIN ZHONG** | \* | |
| | \* | |

**GOVERNMENT'S SUPPLEMENTAL NOTICE OF EXPERT WITNESSES**

COMES NOW the United States of America, by and through its attorney Kenyen R. Brown, United States Attorney for the Southern District of Alabama, and pursuant to Fed. R. Crim. P. 16(a)(1)(G), hereby provides this Supplemental Notice of Expert Witnesses:[1]

1. **Kristy Juaire; Supervisory Chemist; United States Coast Guard Marine Safety Laboratory:** Ms. Kristy Juaire is an expert in the field of oil sample analysis. Ms. Juaire received a Bachelor of Science in Geology-Chemistry in 2001. Thereafter, she received her Master of Science in Geology-Chemistry in 2002. Since 2002, Ms. Juaire has worked as a chemist at the United States Coast Guard Marine Safety Lab (MSL) in New London, Connecticut. In 2013, she became the laboratory's supervisory chemist. As a chemist with the MSL, Ms. Juaire has analyzed oil samples in more than 2,500 matters. Further, she has written

---

[1] The government previously provided notice of its intent to offer the expert testimony of Kevin Levy, a computer forensics expert. The government will not call Mr. Levy as an expert witness in its case-in-chief, but reserves the right to call the witness in rebuttal. Because the government will not offer his testimony in its case-in-chief, no notice of his proposed testimony is required under Rule 16. *See United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir., 2004) ("Our case law establishes that, consistent with the plain language of the Rule, the government's presentation of rebuttal testimony without prior notice does not violate Rule 16, since the Rule's notice requirements apply only to the government's case-in-chief.") Thus, the government is not providing a supplemental notice for Mr. Levy.

numerous publications in her field of study.  Ms. Juaire has been qualified as an expert witness and has testified to the results of her analysis in U.S. District Courts on twelve occasions.

The government anticipates that Ms. Juaire will testify about the MSL's analysis of oil samples taken from the *M/T Stavanger Blossom*.  A report of Ms. Juaire's analysis and results has been previously provided to counsel for the defendants.  The report, and more than 300 pages of analysis, have been provided to defense counsel in discovery and is available for review by defendants' proposed expert witness.  Ms. Juaire is prepared to testify consistent with her reports.

Ms. Juaire will testify to the analysis of oil samples obtained from the *M/T Stavanger Blossom* by personnel with the United States Coast Guard (USCG), Sector Mobile.  Samples one through nine, eleven, and twelve of Lab Number 15-019, and samples one through five of Lab Number 15-039, were obtained using sorbent pads to collect a quantity of suspected oil from portions of the vessel.  Samples ten and thirteen of Lab Number 15-019, were entirely liquid samples obtained from storage tanks aboard the vessel.  After collection, USCG personnel placed each of the sixteen sorbent pads and the two liquid specimens in sample jars, secured the jars, and shipped them to the MSL in New London, Connecticut for analysis.

Once the samples arrived at the MSL, technicians processed and prepared the samples for analysis.  Specifically, technicians created eighteen neat vials containing purely liquid samples. For the sample jars containing sorbent pads and sample 13 of Lab Number 15-019, a solvent was added to the sample jar and the liquid solvent-oil solution was extracted.  This solution was placed into neat vials for testing.  Samples six, seven, eight, eleven, and twelve of Lab Number 15-019, and samples one through five, of Lab Number 15-039, produced solutions that were too dilute for testing and nitrogen was used to concentrate the samples.  Sample ten of Lab Number

15-039 provided sufficient liquid to extract a sample for testing; thus, a portion of this liquid was placed into a neat vial for testing.

Once technicians created the eighteen neat vials, the samples within the vials were tested using both gas chromatography (GC) and gas chromatography-mass spectrometry (GC-MS). One milliliter or less of the contents of the neat vial are extracted and analyzed using these instruments.  Here, the samples were first analyzed using the GC, which separated the contents of the oil sample mixture into individual components for identification.  The product contained within the oil sample mixture is identified by identifying relative retention times for compounds within the sample.  The instrument produced a chart displaying the compounds in visual format, which is known as a chromatogram. (The GC chromatograms for each sample have been provided to counsel for the defendants in discovery.)  Petroleum oil contains unique, specific compounds that are displayed in a GC chromatogram in a predictable, reproducible, and constant pattern.  This pattern is internationally recognized by the American Society for Testing Materials (ASTM).

Following GC testing, the neat vial samples were then tested using a gas chromatography-mass spectrometry (GC-MS) instrument. Again, a small portion of the contents of the vial was analyzed via the GC-MS instrument.  While the GC is capable of detecting all compounds in the sample, the GC-MS is programmed to analyze specific compounds.  In this case, the GC-MS was programmed to analyze compounds specific to petroleum oil.  At the conclusion of the analysis, the GC-MS created a chromatogram for each of these petroleum-specific compounds.  (The GC-MS chromatograms for each sample were provided to counsel for the defendants in discovery.)  Like the GC chromatogram, the ASTM has established unique fingerprints for compounds identified via a GC-MS that are particular only to petroleum oil.

Ms. Juaire analyzed the GC and GC-MS chromatograms produced as a result of the above analysis.  Ms. Juaire identified unique patterns within the chromatograms created by compounds indicative of only petroleum oil.  Ms. Juaire identified these patterns within each of the eighteen samples.  Relying on her training and experience as a chemist, Ms. Juaire formed the opinion that the samples were petroleum oil because they contained compounds in a pattern and relative abundance that is unique only to that substance.

Further, fuel oil and lubricating oil produce separate unique patterns that are identifiable using the testing procedures described above.  As part of her analysis, Ms. Juaire identified compounds within the eighteen samples that were unique only to fuel oils and lubricating oils.  Thus, Ms. Juaire was able to form an opinion regarding the source of the petroleum oil.  The results of this analysis were previously provided to defense counsel in Ms. Juaire's report of analysis.

Ms. Juaire also compared the oil samples to each other using the same testing technique described above to determine whether any of the samples were identical or "matched".  A match would indicate that the oil samples may have derived from the same storage tank or point source.  The results of this analysis were previously provided to defense counsel in Ms. Juaire's report of analysis.  Ms. Juaire knows from her training and experience, however, that petroleum oil is not static and its signatures can change over time.  Thus, Ms. Juaire will testify that petroleum oil samples may not "match" due to external factors such as dilution, mixing, or adulteration of the source material.

   2. **James Dolan; President Emeritus; Martin, Ottaway, van Hemmen, and Dolan, Inc.:**
Mr. Dolan is an expert in marine engineering and regulatory compliance.  He currently serves as the President Emeritus of Martin, Ottaway, van Hemmen, and Dolan, Inc..  Mr. Dolan received a

Bachelors of Science in Marine and Electrical Engineering in 1962. Following his formal training, Mr. Dolan worked for five years as an engineering officer aboard commercial vessels. Mr. Dolan's experience as an engineering officer included working as a Chief Engineer. Mr. Dolan maintains his Chief Engineer's license.

Thereafter, Mr. Dolan worked for the American Bureau of Shipping for 26 years. During that time he conducted ship surveys to ensure vessels met class compliance. A vessel's class dictates the international requirements and statutory rules a vessel must satisfy in order operate as a commercial vessel. During his 26 years at the American Bureau of Shipping, Mr. Dolan conducted surveys aboard vessels, including oil tankers like the *M/T Stavanger Blossom*, to ensure the vessels complied with class regulations. These surveys included vessels that were both under construction and in operation. In 1987, Mr. Dolan was promoted to Senior Vice President and supervised 5,000 class surveyors.

Mr. Dolan began working with Martin, Ottaway, van Hemmen, and Dolan, Inc., in 1993, where he continues to conduct ship surveys to ensure class compliance. Mr. Dolan also conducts causality investigations and provides consultation services on environmental issues relating to commercial shipping. Mr. Dolan aids the development of environmental regulations and serves on the Marshal Islands Delegation to the International Maritime Organization (IMO), the organization tasked with drafting and implementing MARPOL regulations. Mr. Dolan has served on the IMO's Marine Environmental Protection Committee from 1996 to the present. Further, Mr. Dolan trains ship officers on MARPOL issues and has written articles and lectured on MARPOL and related environmental regulations.

Finally, Mr. Dolan has been qualified as an expert witness in the field of marine engineering and environmental compliance approximately 30 times in Federal District Courts. He has testified as an expert witness in both the United States and the United Kingdom.

In the present case, Mr. Dolan is expected to testify regarding the waste stream management of the *M/T Stavanger Blossom*. Mr. Dolan will rely on his degree in Marine and Electrical Engineering, his experience as an engineer aboard a commercial vessel, his 48 years of experience surveying the construction and maintenance of commercial vessels, and his 19 years of experience related to environmental regulations obtained during his work with the IMO.

Mr. Dolan will testify that the operation of the *M/T Stavanger Blossom* generates wastes. Specifically, soot is generated from the operation of the vessel's economizer, sludge is generated from the purification of fuel and lubricating oil, and oily-water is generated as a result of oil and water draining into the vessel's bilges. Further, garbage is also generated during the course of normal operations aboard the vessel. International regulations, such as MARPOL, and U.S. law, such as the Act to Prevent Pollution from Ships, restrict the discharge of oil and other wastes into the ocean. Some wastes, such as sludge and plastic, may never be discharged into the ocean. Rather, both materials must be collected and either incinerated, or discharged to a shore-side facility. Oily-water in the vessel's bilges may be filtered and discharged using an oil filter known as an Oily-Water Separator (OWS). If the oily-water is not filtered, it must be collected and discharged to a shore-side facility.

Mr. Dolan will explain that the *M/T Stavanger Blossom* must be equipped with an OWS in order to filter the bilge wastes. The OWS must be capable of filtering the oily-water to less than 15 parts-per-million (ppm) of oil, and must be equipped with a device capable of measuring the quantity of oil discharged from the OWS, known as an Oil Content Monitor (OCM). If the

quantity of oil is greater than 15 ppm, the OCM triggers a valve known as a Three-Way Valve, and halts discharge of the oily-water overboard.

Mr. Dolan reviewed the vessel's approved piping diagrams, the technical manuals for the OWS and OCM, photographs of the OWS system, and reports compiled by the USCG in this case.  Relying on his formal training in marine engineering and 48 years of experience conducting ship surveys, Mr. Dolan analyzed the OWS system aboard the *M/T Stavanger Blossom*.  Based on the above, Mr. Dolan will explain how the OWS system aboard the *M/T Stavanger Blossom* should operate if it is fully functional.  Mr. Dolan also reviewed reports of the interview of Ship Surveyor Lloyd Fonseca and his photographs that showed a corroded baffle plate with a hole inside the OWS.  Based on Mr. Dolan's training and experience, he will concur with Mr. Fonseca's assessment and testify that the OWS was inoperable at the time of the inspection, and explain that the damaged baffle plate inside the OWS would render the OWS incapable of filtering oil.

As noted above, Mr. Dolan reviewed the approved piping diagram for the *M/T Stavanger Blossom*.  He also reviewed photographs of a "magic pipe" seized from the vessel, as well as photographs of the pipe installed aboard the vessel by the USCG during their investigation.  Mr. Dolan's experience in the field of marine engineering allows him to understand piping configurations and the flow of liquid through pipes aboard commercial vessels, such as the OWS piping system in this case.  Thus, Mr. Dolan will opine that the magic pipe as installed would allow the overboard discharge of greater than 15 ppm through the recirculation line to the Bilge Tank if back pressure was applied to the line.

Mr. Dolan's review of the vessel included an examination of the piping system for the vessel's Soot Tank.  Mr. Dolan also reviewed photographs of the tank aboard the vessel.  Based

on Mr. Dolan's review of the diagrams, and his training and experience as a marine engineer, Mr. Dolan will opine that the Soot Tank was used to collect soot generated from the vessel's Economizer. The soot would remain in the tank until it was disposed via a pipe system that discharged overboard. Mr. Dolan will explain that this same pipe system would allow any liquid substance placed inside the soot tank, including oily-wastes, to be discharged overboard.

Mr. Dolan reviewed reports of interviews for crewmembers aboard the *M/T Stavanger Blossom* and noted that they described using portable Weldon pumps to transfer oily-wastes into the Soot Tank. Mr. Dolan has worked with Weldon pumps on numerous occasions during his career and is familiar with their use and capabilities. Mr. Dolan will explain that a Weldon pump could be used to transfer oily-wastes from a storage tank aboard the vessel into the Soot Tank using temporary hoses. Mr. Dolan will further explain that a hose connected to the vessel's Bilge Pump piping system would allow the Weldon pump to draw out oily-water from the bilge and pump the waste into the Soot Tank or another location aboard the ship. Once in the Soot Tank, the oily-waste could then be discharged directly overboard.

Mr. Dolan reviewed the OCM manual, vessel piping diagrams, and photographs of the OCM installed aboard the *M/T Stavanger Blossom*. Mr. Dolan will identify the service lines to the OCM, including a pipe that provides a sample from the effluent discharged by the OWS, and a pipe that provides fresh or clean water to the OCM. Based on his experience, Mr. Dolan knows that clean water can be supplied to OCM devices to flush or clean them for testing. Mr. Dolan reviewed the OCM manual and vessel piping configuration and determined that the OCM aboard the *M/T Stavanger Blossom* could be operated while only clean water was supplied to the OCM. Mr. Dolan will opine that by supplying the OCM with only clean water and not a sample

of effluent discharged by the OWS, the OCM could be "tricked" into allowing oily-water with greater than 15 ppm of oil to pass the Three-Way Valve and discharge overboard.

Finally, Mr. Dolan reviewed the vessel piping diagrams for the *M/T Stavanger Blossom* waste stream management system, and photographs taken aboard the *M/T Stavanger Blossom*. Based on his training and experience, Mr. Dolan will explain the associated engineering components, including the Oily-Water Separator, Oil-Content Monitor, Bilge Pump, Three-Way Valve, Overboard Discharge Valve, Economizer, Soot Tank, and Weldon pumps. Mr. Dolan will explain the use of vessel storage tanks such as the Bilge Tank, Dirty Bilge Tank, Fuel Oil Sludge Tank, Waste Oil Tanks, Lube Oil Tank, and the Soot Collecting Tank; as well associated piping, pumps, and hoses. He will also explain the use of various documents from the vessel including, Oil Record Books and other sounding logs. This includes the information required to be recorded in these documents under both MARPOL and APPS.

3. **Kathryn M. Cappetta; Lieutenant Junior Grade; United States Coast Guard:** Lt. Cappetta is a qualified Marine Inspector for the USCG, Sector Mobile. Lt. Cappetta graduated from the USCG Academy with a Bachelor of Science in Mechanical Engineering. Following her graduation, Lt. Cappetta received specialized training in Port State Control examinations and Marine Inspection. Lt. Cappetta is qualified by the USCG as a Port State Control examiner. Lt. Cappetta is currently pursuing a Master of Science in Ocean Engineering.

While serving as a Marine Inspector, Lt. Cappetta inspected large vessels for compliance with U.S. and international law, including inspections to confirm compliance with pollution prevention regulations such as MARPOL and the Act to Prevent Pollution from Ships. Through her formal training, Lt. Cappetta learned to calculate the maximum volume of vessel storage tanks, to conduct soundings of those tanks, and to quantify the amount of fluid in the tanks. Lt.

Cappetta frequently applied this training when she examined cargo and storage tanks aboard commercial vessels and calculated the quantities of fluids contained therein.  Further, Lt. Cappetta reviewed sounding logs and log books, such as the Oil Record Book, to conduct comparisons between the log books and determine the accuracy of the required records.

      Lt. Cappetta will testify regarding her review and comparison of various documents from the *M/T Stavanger Blossom*, including the Oil Record Book, Rough Logs, Daily Sounding Logs, UMS Check Lists, and other associated documents.  Lt. Cappetta will explain that she reviewed the vessel's Rough Logs, Daily Sounding Logs, and UMS Check Lists for sounding data that identified the quantities of oil and oily-wastes in the Bilge Tank, Dirty Bilge Tank, Fuel Oil Sludge Tank, Lube Oil Sludge Tank, and Waste Oil Tank.  Lt. Cappetta will explain that tank soundings aboard the *M/T Stavanger Blossom*, and other commercial vessels, are conducted by measuring the height of the fluid inside the tank in centimeters.  This height measurement is then converted into a volume in cubic meters based on the dimensions and maximum volume of the tank.  Crewmembers aboard the Stavanger Blossom used a formula for each tank to convert the sounding measurement in centimeters to a volume in cubic meters.  These conversion formulas were recorded in Engine Room documents obtained from the vessel and provided to the government by DSD Shipping, AS.

      Lt. Cappetta reviewed the vessel's Rough Logs, Daily Sounding Logs, and UMS Check Lists, and identified the sounding data contained in those logs.  For those measurements that the crew had converted and recorded in cubic meters, Lt. Cappetta relied on the converted measurement to identify the quantity of fluid in the tank on the day of the sounding.  For those measurements that were only recorded in centimeters, Lt. Cappetta relied on her training and experience and used the vessel's conversion formulas to calculate the volume in cubic meters.

Upon the conclusion of this analysis, Lt. Cappetta determined the actual quantities of oil and oily-wastes inside the storage tanks aboard the *M/T Stavanger Blossom* on each day of sounding.

Specifically, Lt. Cappetta compiled the daily quantities recorded in the vessel's logs for the Fuel Oil Sludge Tank and Lube Oil Sludge Tank from May 2014, to November 2014; and the Bilge Tank and Dirty Bilge Tank from August 2014, to November 2014.  Further, Lt. Cappetta identified every instance where the logs reflected a decrease in the quantities of oil and oily-wastes in the storage tanks.  Lt. Cappetta will explain that this decrease indicates a discharge or disposal of wastes aboard the vessel.  By calculating these decreases in quantities of oil and oily-wastes, Lt. Cappetta was able to determine the total amount of oil and oily-waste discarded from the vessel.

After conducting this analysis, Lt. Cappetta compared the true quantity of oil and oily-wastes from the logs to the quantities recorded in the Oil Record Book by Chief Engineer Daniel Dancu, Chief Engineer Bo Gao, and Fourth Engineer Xin Zhong.  Lt. Cappetta compared the quantity for each tank on the sounding date to quantity recorded in the Oil Record Book on the identical date.  Lt. Cappetta determined that the quantities of oil and oily-wastes in the Oil Record book were inconsistent with the quantities recorded in the logs.  Further, Lt. Cappetta found that the Oil Record Book did not record the discharges she calculated from the logs.  Lt. Cappetta's analysis also revealed that the Oil Record book repeated identical quantities for the generation, transfer, and disposal of oil and oily-wastes.

Thus, Lt. Cappetta will testify that the Oil Record Book was fictitious, that the Oil Record Book was inconsistent with sounding logs found aboard the *M/T Stavanger Blossom*, and that the sounding logs reflect the discharge of oil and oily-wastes from the *M/T Stavanger Blossom* not recorded in the Oil Record Book.

    4.  **Fred Reynolds; Special Agent, United States Coast Guard Investigative Service:**

S/A Reynolds is an expert in the forensic analysis and visual enhancement of digital videos.  S/A Reynolds obtained a Bachelor of Science in Computer Science, with a minor in Mathematics, in 1999.  After graduation, S/A Reynolds enlisted in the United States Air Force (USAF).  In 2001 he began conducting cyber investigations for the USAF.  Thereafter, S/A Reynolds attended the USAF Special Investigations Training Academy, and became a Special Agent and designated Computer Crime Investigator in 2004.  S/A Reynolds was soon promoted to chief of the Computer Investigations and Operations Branch, Detachment 303, Travis Air Force Base.  In 2007, S/A Reynolds transferred to the Defense Computer Forensics Laboratory, Department of Defense Cyber Crime Center, in Linthicum, Maryland.  S/A Reynolds subsequently obtained employment as a special agent with the USCG Electronic Crimes Section.

    S/A Reynolds is expected to testify regarding his visual enhancement of digital videos recorded by crewmember Keith Enong aboard the *M/T Stavanger Blossom*.  As described in his curriculum vitae, S/A Reynolds has obtained training in the use of computer software to enhance images and videos.  While serving with the USCG Electronic Crimes Section, S/A Reynolds has applied his training and enhanced digital videos for review by the USCG and other agencies.  Further, S/A Reynolds has continued to consult with the Defense Computer Forensics Laboratory as part of his work in this field.

    In the present case, Enong advised the USCG that he recorded four videos at night that showed crewmembers walking onto the deck of the *M/T Stavanger Blossom* from the interior of the vessel.  A review of those videos revealed that they were too dark to provide sufficient clarity.  In order to increase the clarity of the videos, S/A Reynolds obtained the original memory card used to record the four videos from inside Enong's camera and made a forensic copy of the

memory card for analysis. This copy was identical to the original memory card, but ensured the original was not altered. S/A Reynolds then reviewed the forensic copy, locating the four videos recorded by Enong and exporting them for further analysis.

S/A Reynolds examined the four videos and determined that they had been recorded sideways. Thus, he first rotated the videos 90 degrees to properly display the recorded images. S/A Reynolds then used two commercial computer software programs to enhance the clarity of the four videos. These programs included "VLC" and "Video Cleaner." As S/A Reynolds will explain, the software does not change the content of the video; it changes how the computer interprets the video and visually presents the colors onto a display device. Specifically, the software offers filters to brighten or lighten the image, sharpen the image for refinement, increase the resolution or contrast, and enhance focus. These filters are similar to those found in home televisions, and are all designed to bring out the details of a video for greater clarity.

After rotating the image, S/A Reynolds used the computer software's filters to increase the contrast and clarity of the videos. S/A Reynolds applied increased contrast to the videos, deblurred the videos to increase detail, and sharpened the grayscale for image refinement. At the conclusion of this process, S/A Reynolds produced both a color version of the videos and a black and white version.[2] In addition, S/A Reynolds cropped out sections of video where there was only dead space and no image was viewable, and produced still images showing portions of the clarified videos. S/A Reynolds analysis yielded forensic copies of the four original videos, three videos enhanced for clarification, enhanced videos that were cropped, and still images showing

---

[2] S/A Reynolds determined that one of the four videos was two dark and could not be enhanced using the computer software. Only three of the four videos yielded a video that was enhanced to increase clarity.

the increased clarity. These were all previously provided to defense counsel in discovery for their review.

Accordingly, as described above, S/A Reynolds will testify to his use of computer software to increase the clarity of the digital videos recorded by Keith Enong aboard the *M/T Stavanger Blossom*.

Dated at Mobile, Alabama this 7th day of October, 2015.

> Respectfully submitted,
>
> KENYEN R. BROWN
> UNITED STATES ATTORNEY
>
> */s/ Michael D. Anderson*
> MICHAEL D. ANDERSON
> Assistant United States Attorney
>
> */s/ Shane N. Waller*
> SHANE N. WALLER
> Trial Attorney
> U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that, on October 7th, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for petitioner.

> */s/ Shane N. Waller*
> SHANE N. WALLER
> Trial Attorney
> U.S. Department of Justice