**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | |
| | * | |
| **DSD SHIPPING, AS** | * | 1:15-CR-00102-CG |
| **BO GAO** | * | |
| **XIAOBING CHEN, and** | * | |
| **XIN ZHONG** | * | |
| | * | |

**GOVERNMENT'S TRIAL BRIEF**

COMES NOW the United States of America, by and through its attorney Kenyen R. Brown, United States Attorney for the Southern District of Alabama, and files this Trial Brief summarizing the case to be presented and the applicable law. The Trial Brief also identifies evidentiary and legal issues that the government anticipates will need to be addressed prior to or during trial.

**LEGAL FRAMEWORK**

The Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901 et seq., and the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (together known as MARPOL), control the discharge of oil wastes from vessels like the *M/T Stavanger Blossom*. These regulations apply to all commercial vessels operating in the navigable waters of the United States or while in a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States. 33 U.S.C. § 1902(a)(1)-(3). APPS makes it a crime for any person to knowingly violate MARPOL, APPS, or regulations promulgated under APPS. 33 U.S.C. § 1908.

1

Under APPS and MARPOL, oily-water contained in a vessel's bilge may not be discharged into the ocean without being filtered through an OWS.  APPS and MARPOL also preclude the discharge of sludge from the vessel into the ocean.  Sludge must either be incinerated aboard the vessel or discharged to a shore-side facility for disposal.  Further, APPS regulations require that vessels such as the *M/T Stavanger Blossom* maintain an ORB in which the disposal and discharge overboard of sludge, oil residue, oily mixtures, and machinery space bilge water must be recorded.  33 C.F.R. § 151.25(d).  Discharges from the machinery spaces must be fully and accurately recorded in the ORB without delay by the person in charge of the operations.  33 C.F.R. § 151.25 (d) and (h).  The ORB also must record any emergency, accidental, or other exceptional discharges of oil or mixtures, including a statement of the circumstances, and reasons for, the discharge.  33 C.F.R. § 151.25(g).  The ORB must be maintained aboard the vessel for not less than three years, and be readily available for inspection at all reasonable times. 33 C.F.R. § 151.25 (k).

APPS and MARPOL also prohibit the overboard discharge of plastic or garbage mixed with plastic from the vessel.  33 C.F.R. § 151.67.  Vessels such as the *M/T Stavanger Blossom* must maintain a written record, known as a Garbage Record Book (GRB), in which the discharge overboard of all garbage must be recorded, including the date and time of the discharge, the latitude and longitude of the ship, the categories of the garbage involved, and the estimated amount of each category of garbage involved.  33 C.F.R. § 151.55(d).  A record of each discharge must be made at the time of the operation and certified as correct by the master of the ship.  33 C.F.R. § 151.55(f).

The United States Coast Guard (USCG) is an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States, and is empowered to

board vessels, conduct inspections and investigations of potential violations, and to determine compliance with MARPOL, APPS, and related regulations. 14 U.S.C. § 89(a). In conducting inspections, USCG personnel rely on the statements of the vessel's crew and documents, including information contained in the ORB and GRB. The USCG is specifically authorized to examine a vessel and its record books for compliance with MARPOL and APPS. 33 U.S.C. § 1907(d); 33 C.F.R. § 151.23(a)(3) and (c); MARPOL Protocol, Annex V, Regulation 9(5); and 33 C.F.R. § 151.61(a) and (c).

## SUMMARY OF THE EVIDENCE

The *M/T Stavanger Blossom* is an ocean-going oil tanker involved in the international transportation of crude oil. The vessel is owned and operated by DSD Shipping, AS, a Norwegian company with headquarters in Norway and Singapore. During the period charged in the Indictment, the *M/T Stavanger Blossom* had an Engine Department headed by a Chief Engineer, who was assisted by a Second Engineer, a Third Engineer, a Fourth Engineer, and other crewmembers. The Chief Engineer had overall responsibility for the operation of the Engine Department, while the Second Engineer provided direct supervision of daily operations.

The operation of large marine vessels, like the *M/T Stavanger Blossom*, generates large quantities of sludge, oil residue, oily mixtures, and machinery space bilge water. Sludge is generated during the process of purifying fuel oil, lubricating oil, and other petroleum products, so that these products can be used in the engines aboard the vessel. The sludge generated as a result of this process is stored aboard the vessel in sludge tanks. Sludge may properly be disposed of either by incineration aboard the vessel or by offloading it at a port through the use of a licensed hauler and disposal facility.

Oil-contaminated machinery space bilge water is created when water mixes in the bottom of the vessel, known as the "bilges," with oil that has leaked and dripped from the machinery and the lubrication and fuel system for the engines. These "oily mixtures" are collected, stored, and processed to separate the water from the oil and other wastes using a pollution prevention control device known as an Oily-Water Separator (OWS) and an oil-sensing device known as an Oil Content Monitor (OCM).  Machinery space bilge water may be discharged overboard only after passing through an OWS to ensure that it contains less than 15 parts per million ("ppm") of oil, as measured by the OCM.  If the OCM detects an oil content of greater than 15 ppm in the effluent, it sounds an alarm, and diverts flow through a recirculation line back to the bilges in order to prevent the discharge of greater than 15 ppm of oil overboard.

The Chief Engineer aboard the *M/T Stavanger Blossom* was responsible for tracking the disposal and transfer of sludge, oil residue, oily mixtures, and machinery space bilge water from the vessel and making entries into an Oil Record Book (ORB).  The Fourth Engineer provided assistance by supervising the daily sounding of oil storage tanks aboard the vessel, and providing the soundings to the Chief Engineer for entry into the ORB.  The Fourth Engineer was also responsible for the operation of the ship's OWS and incinerator.

Chief Engineers served three month contracts aboard the *M/T Stavanger Blossom*.  From November 2009 to January 2010, Erling Magne Engdal served as the Chief Engineer aboard the *M/T Stavanger Blossom*.  During that time, Ehrling found that the OWS aboard the *M/T Stavanger Blossom* did not function properly.  Ehrling advised Chief Engineer Daniel Dancu and DSD Shipping of the malfunctioning OWS via a changeover memo.  The memo advised Dancu and DSD Shipping that the OWS was not functioning properly as it could not reduce the quantity of oil in the bilge tank effluent below 15 ppm.  The memo advised that the only way to allow the

OWS to discharge was to trick the OCM by flushing it with clean water, however, this resulted in the discharge of water with greater than 15 ppm of oil. The memo warned that, "[s]ome day, it might end up that someone is getting caught for polluting."[1]

After beginning his contract in 2010, Dancu confirmed that the OWS was not operating properly. Although DSD Shipping knew of the problem, they took no steps to repair or replace the OWS. Because oily-water continued to accumulate in the bilges, the Engine Department made discharges via the OWS by supplying fresh water to the OCM to trick the system into discharging. This resulted in the discharge of water that was greater than 15 ppm of oil.

In 2011, the *M/T Stavanger Blossom* entered drydock for scheduled maintenance and repairs. At that time, the OWS was not repaired or replaced. Rather, DSD Shipping installed a bypass pipe that connected the overboard discharge valve to the bilge tank recirculation line. This bypass was capable of forcing the OWS to discharge oily-water from the vessel regardless of its oil content.

From 2010 to November 2014, the *M/T Stavanger Blossom* used various illegal methods to manage wastes aboard the vessel. First, as discussed above, the crew would trick the OWS into discharging oily-water by supplying clean water to the OCM during operation. Second, the vessel's bypass pipe allowed the ship to discharge oily waste regardless of the effluent's oil content. Third, the crew would connect temporary hoses to the waste oil tanks and use portable pumps to transfer the waste oil into the Soot Collection Tank, where it would be discharged directly overboard.

---

[1] Senior Surveyor Irwin Fonseca with Lloyd's Register inspected the M/T Stavanger Blossom while it was in docked at the Port of Mobile in November 2014. During the inspections, Fonseca found that the diaphragm inside the OWS was corroded and that a hole had formed. This defect would have precluded the OWS from operating properly, and required the repair or replacement of the OWS.

Chief Engineer Dancu and Chief Engineer Bo Gao rotated in three month contracts while these illegal discharges occurred. Although they were required to record the overboard discharge of oil and oily-wastes from the vessel, neither Gao or Dancu recorded the discharges. Instead, the two recorded fictitious entries in the ORB in order to hide the discharges. The two also made entries stating that the OWS was operating when it was not, in order to further hide the discharges.

In October 2014, the vessel prepared to arrive in the Port of Lake Charles, located in the Western District of Louisiaina. The vessel was overdue for a Port State Control examination by the U.S. Coast Guard and the crew made preparations for the vessel's arrival in the United States. Second Engineer Xiaobing Chen located the bypass pipe during an inspection of the Engine Room. He informed Dancu that there was a problem and that the USCG could find the pipe. Dancu and Second Engineer Chen made the decision to replace the pipe to hide the bypass before the vessel arrived in the United States.

Thereafter, Chen ordered Fitter Rolando Babon to remove the bypass pipe, fabricate a new pipe, and install that pipe. The new pipe did not allow a connection between the bilge recirculation line and the overboard discharge valve. After the pipe was installed, the Second Engineer ordered the new pipe painted to hide the vessel alteration.

When the vessel arrived in Lake Charles, Louisiana, the U.S. Coast Guard inspected the vessel, including the engine room and the ORB. No pollution violations were identified at that time.

The vessel subsequently departed from Lake Charles and travelled to Mexico. While the vessel was underway, crewmembers emptied and cleaned the Fuel Oil Sludge Tank. The sludge was removed from the tank and placed inside black plastic bags for disposal. As many as 100

6

plastic bags were filled full of sludge, oily rags, and other oil wastes. The bags were stored aboard the vessel while it entered and left port in Mexico. Although the entire Engine Department knew that the tank was cleaned, this operation was not recorded in the ORB as required.

After leaving Mexico, the vessel travelled toward the Port of Mobile, in the Southern District of Alabama. Before arriving in Mobile, Chen and Fourth Engineer Xin Zhong ordered crewmembers to move the plastic bags of sludge onto the deck of the vessel. From there, the bags were thrown overboard into the ocean. This discharge of sludge was not recorded in the ORB. The discharge of plastic was not recorded in the GRB.

On November 8, 2014, Fitter Babon sent an email to the USCG reporting that a bypass pipe had been installed on the vessel and that crewmembers discarded plastic bags containing fuel oil sludge overboard. On or about November 12, 2014, the *M/T Stavanger Blossom* docked at the Plains Terminal in Mobile. A subsequent search of the Engine Room revealed a bypass pipe located in the vessel's central stores. Inspectors observed that the pipe appeared to have traces of oil inside. An analysis of the liquid by the USCG Marine Safety Lab confirmed the substance to be heavy fuel oil. The bypass pipe was found to fit perfectly into the vessel's OWS piping.

USCG inspectors obtained oil samples from other parts of the vessel. At the inspectors' request, Chen and the Engine Cadet Shichao Pan removed the discharge pipe connected to the overboard discharge valve. Once it was removed, inspectors observed the crewmen wiping inside the overboard discharge valve with their gloves. Inspectors stopped the crewmen and obtained a sample from inside the overboard discharge valve. The sample revealed that a black

liquid substance was inside the valve.  A subsequent analysis of the liquid by the USCG Marine Safety Lab confirmed the substance to be a mixture of fuel oil and lubricating oil.

USCG inspectors interviewed crewmembers aboard the vessel.  When asked about cleaning the sludge tank, crewmembers advised that less than 12 bags were filled with sludge and that those bags remained on the vessel.  The crewmembers subsequently admitted that these were false statements.  The crewmembers advised that Chen and Zhong had ordered them to lie to the USCG about the number of bags that resulted from the tank cleaning.

USCG inspectors examined the ORB and found that each entry included the date, a measurement for one or more of the engine room storage tanks, and the signature of the Fourth Engineer and the Chief Engineer.  Chief Engineer Gao made entries in the ORB from May 24, 2014, to August 24, 2014.  Chief Engineer Dancu made entries from August 25, 2014, to November 11, 2014.  Fourth Engineer Zhong began countersigning entries on June 19, 2014.

The ORB was compared to handwritten sounding logs taken aboard the vessel by the engine room crewmembers.  The comparison revealed that the ORB entries for measurements of the Bilge Tank, Dirty Bilge Tank, Fuel Oil Sludge Tank, and Lube Oil Sludge Tank were almost entirely fictitious.  Further, the ORB did not document any direct overboard discharges of bilge waste or oil sludge from May to November, 2014.  The ORB also did not document the cleaning of the Fuel Oil Sludge Tank on November 5, 2014.  Notably, the sounding logs revealed that as much as 16,000 gallons of oily-waste was discharged from the vessel without being recorded in the ORB.  These discrepancies occurred during times when both Gao and Dancu served as Chief Engineer aboard the vessel.

**EVIDENTIARY ISSUES**

**I.      Admissibility of photographs and videos taken aboard the *M/T Stavanger Blossom.***

To be admissible at trial, photographs and videos must be authentic – they must be what they purport to be – and they must be relevant. Fed. R. Evid. 401, 901. *See also United States v. Cejas*, 761 F.3d 717, 723 (7th Cir. 2014). "Authentication or identification under rule 901 merely involves the process of presenting sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be. Once that prima facie showing has been made, the evidence should be admitted . . . ." *United States v. Caldwell*, 776 F.2d 989, 1001-02 (11th Cir. 1985); *see also United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010) (same). Evidence may be authenticated by its "appearance, contents, substance, internal patterns, or other distinctive characteristics . . . taken together with all the circumstances." Fed. R. Evid. 901(b)(4). Further, authentication may be established "solely through the use of circumstantial evidence." *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir.1990).

To demonstrate that a photograph or video is authentic, a party offering the evidence must demonstrate that the item is a true and accurate visual depiction. *Cejas*, 761 F.3d at 724 (noting that finding for admission of video was whether it was "a true and accurate representation of what happened"). A witness's testimony that the visual depiction is true and accurate provides a sufficient foundation for admission. *United States v. Castillo-Chavez*, 555 F. App'x 389, 395 (5th Cir. 2014) (Holding that surveillance tape was admissible because witness with knowledge of the items depicted testified that the video was accurate); *United States v. Glawson*, 322 F. App'x 957, 960 (11th Cir. 2009) (Photograph was properly authenticated where witness testified that the person depicted in the photograph "looked like the person she knew").

In the present case, crewmembers Keith Enong and Rolando Babon documented activities aboard the *M/T Stavanger Blossom* by taking photographs and recording videos on their personal electronic devices. Enong, Babon, and other crewmembers who served on the vessel will testify that these photographs and videos are true and accurate depictions of the vessel. This testimony is sufficient to establish that the visual depictions are authentic, and to provide the foundation for their admission at trial.

Defendants' have previously suggested that metadata associated with the crewmember's photographs questions the authenticity of the images. Electronic images are capable of storing file data such as when the file was created, the device that created it, or the images attributes. This "metadata" can be altered or lost through the process of saving or transferring electronic images across devices. For example, when files are transferred from a digital camera, the date created may reflect the date the file was saved to a computer or other storage device, and not the date the picture was taken.

In the present case, the photographs and videos taken by Enong and Babon contain metadata. Some of this metadata reflects file creation dates that post-date when the visual depictions occurred. However, these file creation dates reflect times during which the images were transferred to the USCG. As noted above, metadata can record the date of transfer to a storage device as a creation date; thus, creation dates consistent with the dates of transfer corroborate the anticipated witness testimony. Contrary to defendants' contention, this data does not undermine the authenticity of the photographs and videos. Furthermore, even assuming defendants' contentions have merit, any question regarding the reliability of the images is reserved for the jury. *See Belfast*, 611 F.3d at 819 (Once the proponent has established a prima facie case, the court may admit the evidence, and the ultimate question of its reliability is

reserved for the fact finder.); *United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) ("Once the proponent has made the requisite showing, the trial court should admit the exhibit . . . in spite of any issues the opponent has raised about flaws in the authentication. Such flaws go to the weight of the evidence instead of its admissibility.") (citation and internal quotation marks omitted).

## II.     Admissibility of videos with enhanced clarity.

As noted above, crewmember Keith Enong recorded videos aboard the *M/T Stavanger Blossom* using his personal electronic device.  Specifically, Enong recorded four videos that showed crewmembers walking onto the deck from the interior of the vessel.  These videos were taken at night, and a review of the videos revealed that they were dark and difficult to view.

S/A Fred Reynolds with the USCG Electronic Crimes Section enhanced the four videos to increase their clarity.  S/A Reynolds used commercial computer software programs to increase the clarity of the four videos by altering how the computer interpreted the video and visually presented the colors onto a display device.  Specifically, S/A Reynolds used filters in the software, similar to those found in home televisions, to brighten or lighten the image, sharpen the image, increase the resolution or contrast, and enhance focus.  These filters bring out the details of a video for greater clarity and do not modify the image.  S/A Reynolds produced videos that were enhanced for clarification, in both color and black and white versions.

Federal Rule of Evidence 1002 provides that, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  "However, a duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) under the circumstances it would be unfair to admit the duplicate in lieu of the original." *United States v. Beeler*, 62 F.

11

Supp. 2d 136, 148 (D. Maine, 1999) (citing Fed. R. Evid 1003). "A 'duplicate' means a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e). Videos "that are enhanced so that the images are clearer to depict are also 'duplicates' so long as the tapes accurately reproduce the original images on the tape." *Beeler*, 62 F. Supp. 2d at 148. *See also United States v. Seifert*, 351 F. Supp. 2d 926, 928 (D. Minn., 2005) (finding government laid an adequate foundation for admission by showing that enhanced video was a fair and accurate depiction of original and accurately reproduced the scenes that took place). Once the videos are shown to be "accurate, authentic, and trustworthy," "the party challenging the rerecordings bears the burden of showing that they are inaccurate." *Beeler*, 62 F. Supp. 2d at 148-149.

Numerous circuits have approved the use of analogous technology and upheld the admission of enhanced audio recordings that were filtered to aid comprehension. *See, e.g., United States v. Howard*, 953 F.2d 610, 613 (11th Cir. 1992) ("[C]courts which have admitted testimony and/or taped copies of recorded conversations to prove their contents have been upheld where the original recordings . . . had been filtered to remove background noise."); *United States v. Snow*, 911 F.2d 726 (4th Cir. 1990); *United States v. Carbone*, 798 F.2d 21, 24 (1st Cir. 1986) ("As long as the tape recording is properly authenticated, we see no reason why a recording that has been enhanced to improve its audibility by filtering out background noises and improving the clarity of the voices should not also be allowed in evidence."); *United States v. Gordon*, 688 F.2d 42, 44 (8th Cir. 1982) ("Use of filtered tapes is permissible when the originals contain significant background noise."); *Fountain v. United States*, 384 F.2d 624, 631 (5th Cir. 1967) ("[T]he availability of a reliable method of removing the interference by making a copy and running it through the noise suppression device sufficiently justify the admission and use of

the copy."). To lay the proper foundation for the enhanced audio tapes, the government must simply demonstrate that the copy is an "accurate reflection" of the original. *Fountain,* 384 F.2d at 631; *see also United States v. Bessent*, 996 F.2d 1212 (4th Cir. 1993) (Noting that the tapes were authenticated by the testimony of an agent who "verified their accuracy"); *Beard v. United States*, 535 A.2d 1373, 1382 (D.C. 1988) ("[T]he trial judge must determine whether the enhanced tape accurately reflects the original before admitting the enhanced tape into evidence.").

In the present case, Enong will testify that both the original videos and the clarified copies are accurate and authentic depictions of what he personally observed. S/A Reynolds will further explain the standard, trustworthy process he employed to filter the videos to increase their clarity. Like enhanced audio recordings, these videos qualify as duplicates under Rule 1003 because they accurately reproduce the originals. Accordingly, the government submits that the enhanced video recordings are admissible at trial.

Dated at Mobile, Alabama this 19th day of October, 2015.

    Respectfully submitted,

    KENYEN R. BROWN
    UNITED STATES ATTORNEY

    */s/ Michael D. Anderson*
    MICHAEL D. ANDERSON
    Assistant United States Attorney

    */s/ Shane N. Waller*
    SHANE N. WALLER
    Trial Attorney
    U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that, on October 19th, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendants.

*/s/ Shane N. Waller*
SHANE N. WALLER
Trial Attorney
U.S. Department of Justice