**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

v.

DSD SHIPPING AS, *et al.*,

    *Defendants.*

No. 1:15-cr-00102-CG

No. 1:15-cr-00179-CG

**POSITION OF DSD SHIPPING AS
WITH RESPECT TO SENTENCING FACTORS**

Thomas N. Kiehnhoff (admitted *pro hac vice*)
Katten Muchin Rosenman LLP
1301 McKinney Street, Suite 3000
Houston, TX  77010-3033
(713) 270-3402
(713) 583-2639 (Fax)
tom.kiehnhoff@kattenlaw.com

William E. Scully, Jr. (sculw3127)
Scully & Scully, P.C.
P.O. Box 962
Daphne, Alabama 36526-0962
(251) 626-5052
(251) 626-5051 (Fax)
wscully@scully-law.com

Steven P. Solow (admitted *pro hac vice*)
Robert T. Smith (admitted *pro hac vice*)
Katten Muchin Rosenman LLP
2900 K Street, N.W.
Washington, D.C.  20007-5118
(202) 625-3616
(202) 339-6059 (Fax)
steve.solow@kattenlaw.com
robert.smith1@kattenlaw.com

*Counsel for the Defendant DSD Shipping AS*

## TABLE OF CONTENTS

Table of Authorities ..........................................................................................................iii

Index of Exhibits ............................................................................................................ iv

Introduction.....................................................................................................................1

Overview of Offense Conduct ........................................................................................2

The Statutory Maximum Sentence.................................................................................3

Sentencing Argument......................................................................................................6

I.     The Legal Framework:  An Appropriate Sentence is "Sufficient, But Not Greater Than Necessary," to Accomplish the Goals of Sentencing ................................................7

II.    The Statutory Factors Support the Imposition of a Fine Not to Exceed $300,000 and a Two-Year Term of Probation ..........................................................................................9

      A.    The Section 3553(a) Factors Support the Imposition of a Fine Significantly Below the Statutory Maximum ................................................................................9

            1.    The Nature and Circumstances of the Offense, Including the Dearth of Evidence of Direct Corporate Involvement, Support the Imposition of a Fine of $300,000....................................................................9

            2.    The History and Characteristics of the Defendant, Including Its Status as a First-Time Offender, and Its Existing and Newly-Implemented Compliance Programs, Likewise Support the Imposition of a Low-End Fine................................................................14

                 a)    DSD Had a Compliance Plan in Place at the Time of the Violation .................................................................................15

                 b)    DSD Voluntarily Improved Its Compliance Plan Prior to Conviction..............................................................................18

            3.    A Low-End Fine is "Sufficient, But Not Greater Than Necessary," to Promote the Relevant Goals of Sentencing ...............................22

            4.    A Low-End Fine of $300,000 Would Avoid Unwarranted Sentencing Disparities ...............................................................24

      B.    The Section 3572 Factors Also Support a Fine of Significantly Below the Maximum.................................................................................................25

            1.    DSD's Stature as a Small, Privately-Owned Company Supports a Low-End Fine .........................................................................26

            2.    A Low-End Fine Avoids Collateral Consequences to Innocent Third-Parties.................................................................................26

3.  There is No Identifiable Victim, and Therefore, Restitution is Inapplicable Here ........................................................................27

4.  DSD Did Not Derive Any Pecuniary Gain from the Conduct in Question ......................................................................................27

5.  DSD Has Taken Meaningful Steps to Prevent a Recurrence of the Offense Conduct ......................................................................27

III.    A Two-Year Term of Probation is Appropriate to Ensure that DSD Fully Implements Its Strengthened Compliance Program ........................................28

IV.    Comments to the Revised Pre-Sentencing Investigative Report ........................................29

Conclusion ........................................................................................................29

Certificate of Service ........................................................................................30

# TABLE OF AUTHORITIES

**Case**:

*Ball v. United States*,
  470 U.S. 856 (1985) ................................................................................................4

*Blockburger v. United States*,
  284 U.S. 299 (1932) ...............................................................................................4

*Dorsey v. United States*,
  132 S. Ct. 2321 (2012) ..........................................................................................24

*Gall v. United States*,
  128 S. Ct. 586 (2007) ..............................................................................................7

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ...................................................................................................7

*Pepper v. United States*,
  131 S. Ct. 1229 (2011) .............................................................................................7

*Southern Union Co. v. United States*,
  132 S. Ct. 2344 (2012) ............................................................................................3

*United States v. Abrogar*,
  459 F.3d 430 (3d Cir. 2006) ....................................................................................9

*United States v. Bane*,
  720 F.3d 818 (11th Cir. 2013) .................................................................................3

*United States v. Bobb*,
  577 F.3d 1366 (11th Cir. 2009) ...............................................................................4

*United States v. Olmeda*,
  461 F.3d 271 (2d Cir. 2006) .....................................................................................6

*United States v. Pflum*,
  556 F. Supp. 2d 1554 (D. Kan. 2008) ...................................................................21

*United States v. Royal Caribbean*,
  11 F. Supp. 2d 1358 (S.D. Fla. 1998) .....................................................................5

*United States v. Vaughn*,
  859 F.2d 863 (11th Cir. 1988) .................................................................................4


**Statutes**:

18 U.S.C. § 371 ...................................................................................................1, 9

18 U.S.C. § 1001 .....................................................................................................5

18 U.S.C. § 1001(a)(3) ...............................................................................................5

18 U.S.C. § 1505 .........................................................................................................9

18 U.S.C. § 1512(b) ...............................................................................................1, 7, 9

18 U.S.C. § 1519 ..............................................................................................1, 4, 5, 7, 9

18 U.S.C. § 3553(a) ..........................................................................................7, 8, 9, 25

18 U.S.C. § 3553(a)(2) ........................................................................................7, 22

18 U.S.C. § 3571(b)(3) ...............................................................................................3

18 U.S.C. § 3571(c)(3) ...............................................................................................3

18 U.S.C. § 3571(d) .....................................................................................................3

18 U.S.C. § 3572 ...............................................................................................7, 8, 9, 25

18 U.S.C. § 3572(a) ................................................................................................8, 26

38 U.S.C. § 991(b)(1)(B) .........................................................................................24

33 U.S.C. § 1908(a) .........................................................................................1, 5, 7, 9

**U.S. Sentencing Guidelines:**

U.S. SENTENCING GUIDELINES § 8B2.1 (2015) ..................................................15, 18

U.S. SENTENCING GUIDELINES § 8B2.1(b)(7) (2015) ..............................................21

U.S. SENTENCING GUIDELINES § 8C1.1 (2015) ........................................................14

U.S. SENTENCING GUIDELINES § 8C2.1 (2015) ..........................................................7

U.S. SENTENCING GUIDELINES § 8C2.5 (2015) ...................................................13, 26

U.S. SENTENCING GUIDELINES § 8C2.5(b) (2015) ....................................................12

U.S. SENTENCING GUIDELINES § 8C2.5(c) (2015) ....................................................15

U.S. SENTENCING GUIDELINES § 8C2.9 (2015) ........................................................27

**Other Authorities:**

Mem. from Sally Q. Yates, Deputy Att'y Gen.,
     *Individual Accountability for Corporate Wrongdoing* (Sept. 9, 2015).............................23

U.S. ATTORNEYS' MANUAL § 9-28.500 ......................................................................13

U.S. ATTORNEYS' MANUAL § 9-28.600 ......................................................................15

U.S. Attorneys' Manual § 9-28.1100 ........................................................................27


**Documents from Other Docketed Cases:**

Judgment, *United States v. China Navigation Co.*,
    No. 3:10-cr-05181 (W.D. Wash. Mar. 22, 2010) [DE-10] ..................................12

Judgment, *United States v. Cleopatra Shipping Agency, Ltd.*,
    No. 3:12-cr-00102 (M.D. La. Sept. 12, 2012) [DE-15] .....................................12

Judgment, *United States v. Fairport Shipping Ltd.*,
    No. 3:04-cr-00130 (D. Alaska July 7, 2008) [DE-41] ......................................13

Judgment, *United States v. Ionia Mgmt., S.A.*,
    No. 3:07-cr-00134 (D. Conn. Dec. 12, 2007) [DE-226]....................................12

Judgment, *United States v. Mercator Ship Mgmt., S.A.*,
    No. 1:11-cr-20220 (S.D. Fla. May 6, 2011) [DE-21] .......................................12

Sentencing Tr., *United States v. Diana Shipping Serv., S.A.*,
    No. 2:13-cr-00040 (E.D. Va. Dec. 18, 2013) [DE-151] ........................................13, 15, 26

## INDEX OF EXHIBITS[*]

Exhibit 1—Maintenance record for Oily Water Separator

Exhibit 2—Chief Engineer's Handover Report from May 2010

Exhibit 3—DSD's 2014 Annual Report

Exhibit 4—DSD's Health Safety and Environmental Quality Policy  [SEALED]

Exhibit 5—DSD's Safety Management System  [SEALED]

Exhibit 6—DSD's Compliance Posters  [SEALED]

Exhibit 7—Training Overviews for Seagull Training on DSD vessels

Exhibit 8—DSD's Garbage Management Plan  [SEALED]

Exhibit 9—DSD's Shipboard Auditing Policy  [SEALED]

Exhibit 10—DSD's Superintendent Inspection Report  [SEALED]

Exhibit 11—Wallem's Safety Health and Environmental Quality Policy  [SEALED]

Exhibit 12—Wallem's Environmental Protection Undertaking Requirements  [SEALED]

Exhibit 13—Wallem's MARPOL Compliance Program  [SEALED]

Exhibit 14—Wallem's MARPOL Audit Guidance  [SEALED]

Exhibit 15—Wallem's MARPOL Training Course Outline  [SEALED]

Exhibit 16—Wallem's Code of Conduct  [SEALED]

Exhibit 17—Wallem's Group Whistleblowing Policy  [SEALED]

Exhibit 18—Marine Environmental Protection Committee 107(49)

Exhibit 19—Email from S. Solow to S. Waller and M. Anderson regarding Court-Appointed Monitors

Exhibit 20—Table of Sentences Associated with Prosecutions Under the Act to Prevent Pollution from Ships

Exhibit 21—DSD's Proposed Environmental Compliance Plan

---

[*] Some of the exhibits to this sentencing memorandum contain confidential business information, which DSD has proposed for filing under seal. Accordingly, contemporaneously with the filing of this memorandum, DSD has filed a Motion to File Under Seal Certain Confidential Business Records Cited in Support of Position of DSD Shipping AS with Respect to Sentencing Factors. Consistent with General Local Rule 5.2, DSD has appended the proposed sealed exhibits to the Motion for Leave to File Under Seal. As a result, DSD has appended to this sentencing memorandum only those exhibits that do not contain information subject to its Motion for Leave to File Under Seal. The remaining, proposed sealed exhibits are appended to the Motion for Leave to File Under Seal.

## INTRODUCTION

On November 6, 2015, DSD Shipping AS (DSD) was found guilty on eight of ten counts set forth in two separate indictments.  More specifically, the jury found DSD vicariously liable for the misconduct of its employees, who in the aggregate were convicted of conspiracy under 18 U.S.C. § 371; making false entries in Oil and Garbage Record Books in violation of 33 U.S.C. § 1908(a); obstruction of justice under 18 U.S.C. § 1519 based on similar false entries; and witness tampering in violation of 18 U.S.C. § 1512(b).  For each of these offenses, the maximum possible penalties that may be imposed on DSD are (i) a fine of not more than $500,000; (ii) five years' probation; and (iii) a special mandatory assessment of $400.  That said, because two of the eight charges are multiplicitous, the maximum total fine amount that may be imposed is not more than $3 million, and the special mandatory assessment is capped at $2,400.

As explained below, a sentence of considerably less than the maximum is warranted here because, among other things discussed below: (i) DSD is a first-time offender with a long history as a law-abiding company that profoundly regrets any violation of U.S. law, (ii) the company had in place an existing environmental-compliance program and strengthened that program without regard to the outcome at trial—in part, by out-sourcing the technical management of all of its vessels to Wallem GmbH & Co. KG, which has significant experience operating environmentally-compliant vessels, (iii) DSD voluntarily replaced the OWS on the vessel associated with this case and has verified that the OWS on each of its other vessels are compliant with updated marine guidelines, (iv) the company has agreed to a court-appointed monitor and the implementation of a court-approved environmental compliance plan, and (v) there was a dearth of evidence of high-level corporate involvement in the charged offenses—indeed, the government introduced no evidence that anyone onshore directed or condoned the acts of the

employees charged by the government, and scant evidence of knowledge on the part of the company.  For these reasons and others, DSD respectfully requests that the Court sentence the company to pay a total fine of no more than $300,000 and serve no more than a two-year term of probation.  Such a sentence is consistent with other sentences imposed against similarly-situated corporate defendants involving similar instances of misconduct by their employees.

**OVERVIEW OF THE OFFENSE CONDUCT**

Through two separate indictments, the government alleged that, largely during a three-month period from August to November 2014, members of the crew onboard one of DSD's vessels, the *M/T Stavanger Blossom*, knowingly made false entries in Oil and Garbage Records Books in violation of the Act to Prevent Pollution from Ships, obstructed a federal agency proceeding by making false entries in those same record books, engaged in witness tampering when confronted by the U.S. Coast Guard, sought to obstruct a federal agency proceeding by hiding the existence of a sampling pipe, and conspired to commit one or more of these underlying offenses.  The first indictment was apparently premised on the *M/T Stavanger Blossom*'s entry into the Port of Mobile (the Alabama Indictment), whereas the second was premised on the vessel's entry into the Port of Lake Charles (the Louisiana Indictment).

Shortly before trial, one of the individual defendants, Daniel Paul Dancu, pled guilty to the conspiracy count and agreed to testify against the remaining defendants.  Mr. Dancu for the first time claimed that he had "tricked" the Oil Content Monitor associated with the vessel's anti-pollution equipment, flushing the monitor with fresh water in order to discharge water overboard containing oil in excess of the legal limit of 15 parts per million.  *See* Exh. A at 2, DSD's Mot. for Judgment of Acquittal [DE-227]; Exh. B. at 1-2 [DE-227].  He disputed that a sampling pipe was used as a bypass pipe—as the government maintained before and even after securing his cooperation.  *See* Exh. A at 3 [DE-227]; Exh. B at 1-2 [DE-227].

Following a consolidated trial on both indictments in the Southern District of Alabama, a jury convicted the remaining crewmember defendants on eight of the ten counts, and it found DSD vicariously liable for the same underlying offenses. The jury acquitted the crewmember defendants and the company of the two counts of obstruction of justice for allegedly attempting to hide the existence of the sampling pipe, which the indictments referred to as a "bypass" pipe.

## THE STATUTORY MAXIMUM SENTENCE

DSD agrees with the Probation Office that the statutory maximum that may be imposed against DSD for each of the eight counts of conviction are: (i) a fine of no more than $500,000; (ii) five years' probation; and (iii) a special mandatory assessment of $400. *See* Revised Presentence Investigation Report at 1-2 (Mar. 22, 2016) [DE-266] [hereinafter Revised PSR]. In this regard, the statutory maximum fine amount for organizational defendants like DSD is set at $500,000 by 18 U.S.C. § 3571(c)(3).[1]

At the same time, DSD respectfully disagrees with the Probation Office that, in the aggregate, the statutory maximum fine is $4,000,000 and the mandatory assessment is $3,200. *See* Revised PSR ¶ 47, at 13. The Probation Office derived these amounts by multiplying the number of counts of conviction (eight) by (i) the maximum per-count fine amount ($500,000) and (ii) the $400 mandatory assessment for each count. But the Office did not take into account

---

[1] Unquestionably, 18 U.S.C. § 3571(d) would have allowed the Court to impose a fine based on twice the "pecuniary gain from the offense" or twice the "pecuniary loss to a person other than the defendant," but the government did not introduce any evidence quantifying such an amount during trial, and the jury was not directed to make any such determination. In *Southern Union Co. v. United States*, the Supreme Court held that the rule of *Apprendi*—that a jury must find any fact that increases the statutory maximum sentence—applies to fines imposed against organizational defendants. *See* 132 S. Ct. 2344, 2350 (2012). Based on this ruling, the jury would have been required to find any fact that would increase the statutory maximum fine imposed against DSD, including any amount used under the "federal twice-the-gain-or-loss statute." *Id.* at 2351-52 (citing 18 U.S.C. § 3571(d)). In short, because the government failed to elicit any such factual finding from the jury here, the Court may not impose a fine in excess of the $500,000 maximum for each count, which is the maximum established under 18 U.S.C. § 3571(c)(3). *See also United States v. Bane*, 720 F.3d 818, 830 (11th Cir. 2013) (holding that a fine in excess of the statutory-set maximum for individuals in 18 U.S.C. § 3571(b)(3) could not be imposed under 18 U.S.C. § 3571(d) because the fine was "without a jury finding" and therefore constitutionally impermissible under *Southern Union*).

an important constitutional limitation that prohibits the Court from imposing any sentence based on two of the eight counts of conviction—those counts are substantively identical to two of the other counts of conviction charged in the indictments.  Under the Constitution's Double Jeopardy Clause, DSD may not be convicted and sentenced twice for the same misconduct.

To establish a double-jeopardy violation, "a defendant must show that the offenses are in law and fact the same offense."  *United States v. Vaughn*, 859 F.2d 863, 864 (11th Cir. 1988); *see also Blockburger v. United States*, 284 U.S. 299 (1932).  Where a court "conclude[s] that a defendant has suffered a double jeopardy violation because [it] was improperly convicted for the same offense under two separate counts, 'the only remedy consistent with the congressional intent is for the District Court, where the sentencing responsibility resides, to exercise its discretion to vacate one of the underlying convictions.'"  *United States v. Bobb*, 577 F.3d 1366, 1372 (11th Cir. 2009) (quoting *Ball v. United States*, 470 U.S. 856, 864 (1985)).

Unquestionably, DSD was convicted of two sets of charges that are, in law and fact, identical.  The first pair of relevant charges—namely, Count 1 of the Louisiana Indictment and Count 2 of the Alabama Indictment—involve the same offense statute (the Act to Prevent Pollution from Ships), the same underlying conduct (specifically, that the defendants failed to "maintain" an accurate Oil Record Book), cover overlapping time periods (from August 5 to November 3, 2014, in the case of the Louisiana Indictment, and from August 5 to November 12, 2014, in the case of the Alabama Indictment), and involve overlapping geographic areas (alleging that each offense occurred within the relevant judicial district "and elsewhere").  *Compare* Louisiana Indictment ¶ 16, *with* Alabama Indictment ¶ 22.  The second pair of relevant charges—namely, Count 2 of the Louisiana Indictment and Count 4 of the Alabama Indictment—similarly involve the same offense statute (18 U.S.C. § 1519), the same underlying

- 4 -

conduct (specifically, that the defendants "did knowingly conceal, cover up, and falsify, and make false entries and omissions" in the Oil Record Book with "the intent to impede, obstruct, and influence" a federal agency investigation), cover overlapping time periods (from August 5 to November 3, 2014, in the case of the Louisiana Indictment, and from August 5 to November 12, 2014, in the case of the Alabama Indictment), and involve overlapping geographic areas (alleging that each offense occurred within the relevant judicial district "and elsewhere"). *Compare* Louisiana Indictment ¶ 18, *with* Alabama Indictment ¶ 26.

Moreover, there is nothing about the indictments that *precluded* the jury from using the same facts to convict DSD on both sets of charges.  No doubt, each indictment included unique allegations about the focal port of entry—based on the *M/T Stavanger Blossom*'s visits to the Port of Lake Charles and the Port of Mobile—but those allegations have *no bearing on the specific elements of either of the offense statutes*.  Unlike a prosecution predicated on a false-presentment theory under 18 U.S.C. § 1001—which makes it a crime to knowingly "use" a "materially false, fictitious, or fraudulent writing," 18 U.S.C. § 1001(a)(3), and therefore triggers liability each time a defendant presents a false document, 18 U.S.C. § 1001(a)(3); *see also United States v. Royal Caribbean*, 11 F. Supp. 2d 1358 (S.D. Fla. 1998) (charging the defendant based on a false-presentment theory)—the government twice charged DSD with failing to accurately "maintain" the same Oil Record Book while in the navigable waters of the United States, 33 U.S.C. § 1908(a), and twice charged DSD with obstruction of justice for knowingly making false entries in the same Oil Record Book, 18 U.S.C. § 1519.  Louisiana Indictment ¶¶ 16, 18; Alabama Indictment ¶¶ 22, 26.  What is more, the indictments included overlapping time periods and permitted the jury to impose liability based on conduct within the relevant judicial district "and elsewhere."  Louisiana Indictment ¶¶ 16, 18; Alabama Indictment ¶¶ 22, 26.

- 5 -

Thus, the indictments allowed the jury to convict based on the same alleged false entries to the same Oil Record Book, made at the very same moment in time, and in the very same location. The Double Jeopardy Clause bars successive convictions and punishments in this precise situation. *See, e.g.*, *United States v. Olmeda*, 461 F.3d 271, 290 (2d Cir. 2006) (holding that a federal "indictment's pleading of ammunition possession in the 'Eastern District of North Carolina and elsewhere' is reasonably construed to reference both the North Carolina and New York June 2002 ammunition possessions," and as a result, "double jeopardy bars [the defendant's] pending prosecution in the Southern District of New York for the latter possession"); *see also* DSD Mot. to Dismiss at 28-30 [DE-131].

Accordingly, this Court should vacate two of the relevant counts of conviction, and it is constitutionally precluded from imposing a fine in excess of $3,000,000 or a special assessment in excess of $2,400.

## SENTENCING ARGUMENT

DSD respectfully requests that the Court sentence the company to pay a total fine of no more than $300,000 and serve no more than a two-year term of probation. Such a sentence is consistent with the standards that govern the sentencing of an organization like DSD, and it is fully in line with the types of sentences imposed by courts based on similar instances of misconduct. For a first-time offender like DSD, which has implemented a robust environmental compliance program and agreed to a court-approved environmental compliance plan and a court-appointed monitor, and where there is no evidence of high-level corporate involvement, a fine at the low-end of the range is warranted.

I.      **The Legal Framework:  An Appropriate Sentence is "Sufficient, But Not Greater Than Necessary," to Accomplish the Goals of Sentencing.**

In determining an appropriate sentence, the Court is required to consider the factors set forth in 18 U.S.C. §§ 3553(a) and 3572.  *See Kimbrough v. United States*, 552 U.S. 85, 89-90 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011).  Normally, even in the post-*Booker* era, district courts still must treat the U.S. Sentencing Guidelines as "the starting point and the initial benchmark."  *Gall v. United States*, 128 S. Ct. 586, 596 (2007).  But as the Probation Office correctly determined, the Guidelines do not apply here to the sentencing of DSD.  *See* Revised PSR ¶ 49, at 13 [DE-266]; *see also* U.S. SENTENCING GUIDELINES § 8C2.1, at 513-14 (2015) (explaining through cross-references that the Guidelines do not apply to organizational defendants convicted of 18 U.S.C. § 1512(b), 18 U.S.C. § 1519, 33 U.S.C. § 1908(a), or conspiracy to commit these offenses).

Under Section 3553(a), a sentencing court's "overarching" mandate is to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101; *Pepper*, 131 S. Ct. at 1242-43 (quoting 18 U.S.C. § 3553(a)). Those goals include:  (a) retribution (to reflect the seriousness of the offense, promote respect for the law, and provide "just punishment"); (b) deterrence; (c) incapacitation ("to protect the public from further crimes"); and (d) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment").  18 U.S.C. § 3553(a)(2).

In addition, a sentencing court must consider six factors beyond any applicable Guidelines range under Section 3553(a).  Those six factors are:

(1)     the nature and circumstances of the offense, and the history and characteristics of the defendant;

(2)     the kinds of sentences available;

(3)     the need to avoid unwarranted sentencing disparities;

(4)     the need for restitution;

(5)     the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment; and

(6)     any pertinent policy statements issued by the Sentencing Commission.

*See id.* § 3553(a).

Section 3572, in contrast, governs the specific imposition of a fine—the only real option for an organizational defendant like DSD. That Section provides that, in addition to the factors set forth in Section 3553(a), a sentencing court should consider eight factors in determining whether to impose a fine:

(1)     the defendant's income, earning capacity, and financial resources;

(2)     the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

(3)     any pecuniary loss inflicted upon others as a result of the offense;

(4)     whether restitution is ordered or made and the amount of such restitution;

(5)     the need to deprive the defendant of illegally obtained gains from the offense;

(6)     the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;

(7)     whether the defendant can pass on to consumers or other persons the expense of the fine; and

(8)     if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

18 U.S.C. § 3572(a).

- 8 -

**II.    The Statutory Factors Support the Imposition of a Fine Not to Exceed $300,000 and a Two-Year Term of Probation.**

After weighing the factors discussed above, this Court should sentence DSD to pay a total fine of no more than $300,000 and serve no more than a two-year term of probation under the supervision of a court-appointed monitor.   Such a sentence is "sufficient, but not greater than necessary" to satisfy the applicable factors set forth in 18 U.S.C. §§ 3553(a) and 3572.   And such a sentence is consistent with others imposed against similarly-situated corporate defendants (first-offenders that had in place and strengthened existing compliance programs) involving similar instances of misconduct (false entries in Oil and Garbage Record Books and a lack of high-level corporate involvement).

**A.    The Section 3553(a) Factors Support the Imposition of a Fine Significantly Below the Statutory Maximum.**

**1.    The Nature and Circumstances of the Offense, Including the Dearth of Evidence of Direct Corporate Involvement, Support the Imposition of a Fine of $300,000.**

Through the acts of its employees, DSD was found vicariously liable and therefore convicted of eight counts:  one count of conspiracy in violation of 18 U.S.C. § 371; three counts (two of which are substantively identical) of maintaining false record books in violation of 33 U.S.C. § 1908(a); three counts (two of which are substantively identical) of making false entries with the intent to obstruct an agency proceeding in violation of 18 U.S.C. § 1519; and one count of attempting to influence the testimony of a witness in violation of 18 U.S.C. § 1512(b).   The company was acquitted of two counts of obstruction of justice in violation of 18 U.S.C. § 1505 for allegedly attempting to hide the existence of a "magic pipe."[2]

---

[2] Although several of the record-keeping violations were predicated upon alleged discharges of oil and garbage while the *M/T Stavanger Blossom* was in international waters, the Third Circuit has held such discharges do not violate U.S. law and therefore cannot be considered as relevant conduct for purposes of sentencing a defendant for failing to maintain an accurate record book.  *United States v. Abrogar*, 459 F.3d 430, 434-36 (3d Cir. 2006).

Notably, during the jury trial, the government introduced no evidence that any shore-based executives of the company directed or condoned any of the unlawful conduct charged by the government, and scant evidence that the company had any knowledge of the crew's allegedly unlawful acts.  There was, for example, no evidence that high-level personnel at the company directed the crew to take shortcuts; that they denied requests for needed repairs; or that they took adverse action against anyone who reported concerns.

At most, the government introduced a single document, a hand-over memorandum from January 2010 (almost five years beyond the period charged in the indictments), in which a former chief engineer of the *M/T Stavanger Blossom* raised concerns to the vessel's superintendent and the oncoming chief engineer (Mr. Dancu) about the functioning of the vessel's oily-water separator (OWS).  Gov't Exh. 217.  In that same memorandum, the former chief engineer lamented that, unless the OWS was fixed, "it might end up that someone is getting caught for polluting."  Gov't Exh. 217.

Yet, evidence from just four months later contradicted the January 2010 hand-over memorandum.  Entries in the vessel's computer system dated May 22, 2010, stated that the OWS was working properly and in good condition.  Def. Exh. 446A (admitted) (reattached as Exh. 1); Tr. 1249:22-1250:1.  Similarly, Mr. Dancu reported in a memorandum from around the same time that there were no problems with the vessel's pollution-prevention equipment.  *See* Def. Exh. 431 (proposed but not admitted) (hand-over memorandum dated May 2010, stating that all pollution prevention equipment was operating properly) (reattached as Exh. 2).  Moreover, as the Probation Office notes, "in early 2012, a Lloyd's Register special survey in Spain tested the OWS and detected no issues."  Revised PSR ¶ 14, at 8 [DE-266].

- 10 -

In addition, it appeared that the OWS was functioning properly just a few months before the time period charged in the indictments. More specifically, in May 2014, a Lloyd's Register surveyor inspected the *M/T Stavanger Blossom*, including the vessel's "oil pollution prevention equipment," and issued the vessel an International Oil Pollution Prevention Certificate. Tr. 131:3-21; *see also* Gov't Exh. 220 (International Oil Pollution Prevention Certificate).

Finally, Mr. Dancu testified that that he never informed the company that the record books were false, or that he had tricked the oil content monitor. Tr. 1250:8-16 (Dancu); *accord id.* 1199:21-1200:1. Mr. Dancu testified instead that he deliberately *withheld* this information from the company to protect his own job. *See* Tr. 1250:21-25 (Dancu); *see also* Tr. 1221:14-24 (Dancu) (testifying that he would record fictitious amounts in the record books that were lower than the soundings to create the appearance that the vessel was in compliance with company policies while he was serving on the vessel). There was, however, no credible evidence that the company ever retaliated against any employee for raising concerns or requesting funds for necessary repairs, nor was there evidence that the company denied requests for repairs.

In the end, the jury found that the company was vicariously liable for the conduct of its employees. Unquestionably, that was based on a finding that members of the crew engaged in unlawful acts on one of DSD's vessel—a serious and alarming conclusion.

But there was no evidence from which the jury could find that executives at the company orchestrated or condoned the events charged in the indictments—an equally important consideration for purposes of sentencing a corporate defendant. Indeed, the evidence, even when viewed in a light favorable to the government, suggests that DSD simply missed conflicting signals about the operability of the OWS and put its faith in the wrong people, not that DSD is an unethical, mismanaged, or criminal company.

The lack of direct corporate involvement has been deemed a significant factor in sentencing an organizational defendant.  For example, under the Sentencing Guidelines (which do not have direct application here, but which draw upon a wealth of sentencing experience), the fact that "an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense" warrants a significant increase in the organization's base-offense level.  *See* U.S. SENTENCING GUIDELINES § 8C2.5(b), at 519-20 (2015).  The absence of such high-level involvement, in contrast, effectively produces a reduced base-offense level.  *See id.*

Similarly, in imposing sentences against organizational defendants under the Act to Prevent Pollution from Ships, courts have considered the apparent involvement of high-level personnel in imposing a fine approaching the statutory maximum.  *See, e.g.*, Judgment, *United States v. Ionia Mgmt., S.A.*, No. 3:07-cr-00134 (D. Conn. Dec. 12, 2007) [DE-226] (imposing a fine of $4.9 million against a corporate defendant whose employees engaged in misconduct even after the company was on probation for similar misconduct, suggesting that high-level personnel condoned or were willfully ignorant of systemic problems within the company's fleet).  And, in the apparent absence of high-level involvement, courts have sentenced organizational defendants to fines of considerably less under the Act to Prevent Pollution from Ships.  *See* Judgment, *United States v. Cleopatra Shipping Agency, Ltd.*, No. 3:12-cr-00102 (M.D. La. Sept. 12, 2012) [DE-15] (sentencing corporate defendant to a jointly-agreed fine of $300,000); Judgment, *United States v. Mercator Ship Mgmt., S.A.*, No. 1:11-cr-20220 (S.D. Fla. May 6, 2011) [DE-21] (sentencing corporate defendant to a jointly-recommended fine of $100,000); Judgment, *United States v. China Navigation Co.*, No. 3:10-cr-05181 (W.D. Wash. Mar. 22, 2010) [DE-10] (sentencing corporate defendant to a jointly-recommended fine of $75,000, plus a community-

service payment of $25,000); Judgment, *United States v. Fairport Shipping Ltd.*, No. 3:04-cr-00130 (D. Alaska July 7, 2008) [DE-41] (sentencing corporate defendant to a fine of $100,000); *see also* Sentencing Tr. at 42:2-12, 51:1-3, *United States v. Diana Shipping Serv., S.A.*, No. 2:13-cr-00040 (E.D. Va. Dec. 18, 2013) [DE-151] (explaining that it was "a significant fact" that there was "no direct action by the company," and sentencing the corporate defendant to $100,000 per count, well below the government's recommendation of $400,000 per count).

The relevance of a lack of high-level involvement is evident.  DSD was made up of several hundred officers, employees, and agents, the vast majority of whom had no involvement in the charged conduct, and its owners and investors likewise had no involvement in committing the relevant offenses.  The absence of high-level involvement suggests that the offense conduct was an aberration, rather than a systemic problem, and it leaves open the possibility—a reality in this case—that the company is properly managed and will remedy past mistakes without the need for imposing a sentence that has the collateral effect of punishing innocent employees, owners, and investors.  *Cf.* U.S. SENTENCING GUIDELINES § 8C2.5, at 523, cmt. n. 4 (2015) ("Pervasiveness [is] case specific and [will] depend on the number, and degree of responsibility, of individuals [with] substantial authority . . . who participated in, condoned, or were willfully ignorant of the offense. Fewer individuals need to be involved for a finding of pervasiveness if those individuals exercised a relatively high degree of authority."); *see* U.S. ATTORNEYS' MANUAL § 9-28.500 (noting that "it may not be appropriate to impose liability upon a corporation, particularly one with a robust compliance program in place, under a strict *respondeat superior* theory for the single isolated act of a rogue employee").

2. **The History and Characteristics of the Defendant, Including Its Status as a First-Time Offender, and Its Existing and Newly-Implemented Compliance Programs, Likewise Support the Imposition of a Low-End Fine.**

DSD is a Norwegian corporation that owns and operates a fleet of international shipping vessels. *See* Exh. 3, DSD AS 2014 Annual Report, at 3. The company was organized as an integrated shipping operation with its headquarters in Stavanger, Norway, and a branch office in Singapore. *Id.* In 2014, DSD's fleet consisted of four crude-oil-tanker vessels, including the *M/T Stavanger Blossom*, and five product-tanker vessels. *Id.*

DSD is a wholly-owned subsidiary of DSD Group, *id.* at 1, which has expressed its commitment to limit as much as possible the burden on the environment in ship operations and public transportation on land. Thus, DSD Group has aimed to be at "the forefront of development and . . . an initiator and innovator within eco-friendly transportation." *Id.* Examples of this commitment are recounted in the margin.[3]

DSD has no prior criminal history. Its vessels have visited ports of the United States countless times since the formation of the company in 1989. And yet, for over 25 years, DSD had never been accused, let alone convicted, of violating U.S. law. Thus, DSD plainly does not fall within the narrow category of organizations operated primarily for a criminal purpose or primarily by criminal means. *Cf.* U.S. SENTENCING GUIDELINES § 8C1.1, at 513 (2015); *see also id.* at 499 (noting that significant penalties are warranted for organizations operated primarily for a criminal purpose or primarily by criminal means). Instead, DSD's history as a legitimate, law-

---

[3] To achieve its commitment to the environment, DSD Group has implemented cleaner technologies for powering transportation in each of its subsidiaries. Exh. 3, DSD AS 2014 Annual Report, at 6. For example. one of these subsidiaries, Tide ASA, a major bus transportation company in Denmark and Norway, operates 200 gas-powered buses and six clean power articulated buses. *Id.* Another subsidiary, Norled AS operates passenger and car ferries that run on natural gas, including the first two ferries in the world to operate solely on liquefied natural gas, resulting in significant emissions reductions. *Id.* In 2015, Norled AS began operating the world's first battery-operated, car ferry. *Id.* Nor Lines AS, a marine freight company, is investing in new gas-powered vessels that will replace older vessels in the company's fleet resulting in decreased emissions and greater efficiency. *Id.*

abiding enterprise is an important mitigating factor that should be considered by this Court when imposing sentence.  *See* U.S. Sentencing Guidelines § 8C2.5(c), at 520 (2015) (deeming the existence of a prior history of misconduct relevant to enhancing the sentence of an organizational defendant); *cf.* U.S. Attorneys' Manual § 9-28.600 ("A corporation, like a natural person, is expected to learn from its mistakes.  A history of similar misconduct may be probative of a corporate culture that encouraged, or at least condoned, such misdeeds, regardless of any compliance programs.").

Moreover, as detailed below, DSD had a compliance plan in place at the time of the violation, and even before it was convicted in this matter, the company took steps to improve upon that program.  The fact that certain employees engaged in misconduct does not establish that DSD's existing compliance program was inadequate.  U.S. Sentencing Guidelines § 8B2.1, at 507 (2015) ("The failure to prevent or detect the instant offense does not necessarily mean that the program is not generally effective in preventing and detecting criminal conduct."); *see also* Sentencing Tr. 40:20-24, *United States v. Diana Shipping Servs., S.A.*, No. 2:13-cr-00040 (E.D. Va. Dec. 18, 2013) [DE-151] (explaining that, although there was "more that could have . . . been done by the company" to prevent the criminal misconduct at issue, that "doesn't mean that the company did not have already in place certain protections" designed to prevent and detect the misconduct at issue).  In addition, DSD has taken this matter seriously—even while it stood by the crewmember defendants who maintained their innocence—by putting in place an even more comprehensive environmental-compliance program.

### a)      *DSD Had a Compliance Plan in Place at the Time of the Violation.*

At the time that the conduct of conviction occurred onboard the *M/T Stavanger Blossom*, DSD had a set of policies and procedures in place to identify and prevent the exact behavior at

issue in this case.  The company's Health, Safety, Environment and Quality (HSEQ) Program and Safety Management System (SMS) each addressed marine pollution and compliance with applicable regulations.   For example, the HSEQ Program stated a commitment to "the achievement of *Zero Philosophy* (0-Pollution/Spill, 0-Fatalitites, 0-Detentions), Exh. 4 [SEALED], and the company attempted to meet this commitment by establishing a Designated Person Ashore through whom the crew could direct concerns about "safety and environmental matters," if traditional reporting lines did not address the concern, Exh. 5, at 1 [SEALED].  In addition, the company maintained a "no-blame policy" designed to encourage the detailed reporting of safety and environmental compliance issues, and included a bonus system designed to reward the reporting of violations and "near misses," *id.* at 13.   Finally, the company mandated the prompt reporting to onshore personnel and investigation of any "[d]amage to [the] environment," including "[m]arine pollution."  *Id.* at 15.

In an attempt to make the crew aware of these policies, DSD posted signs on the *M/T Stavanger Blossom* informing them that: (i) the discharge of oil or oily waste was unlawful, and that violators would be subject to possible criminal enforcement; (ii) the crew was prohibited from operating overboard valves without the authority of the Chief Engineer or the Master of the vessel; and (iii) the crew could contact a designated, shore-side person about "safety and pollution prevention" issues through a variety of communication pathways, including 24-hour hotline and a direct e-mail address to the Designated Person Ashore.  Exh. 6 [SEALED].

The company also implemented training programs designed to educate the crew on its obligations under MARPOL. In particular, the company provided computer-based training programs entitled: "Introduction to MARPOL," "Marine environmental awareness," and "Oil Discharge Monitoring Equipment" (ODME).   Exh. 7.   These programs walked participants

through the "six technical annexes" to MARPOL and provided "an overview of pollution control measures"; discussed the "importance of preventing pollution to the marine environment"; and provided guidance on the proper "handling of oil contaminated water originating from cargo/ballast operations" and how to "fill in the Oil Record Book," and "typical tank cleaning process." *Id.*

In addition, the company maintained a Garbage Management Plan that instructed crew members on the proper disposal of different types of garbage, including oily rags.  Exh. 8 [SEALED].  The policy was implemented by assigning the Chief Officer as the crewmember responsible for maintaining the Garbage Record Book and reviewing compliance with the vessel's Garbage Management Plan.  *Id.* at 7.  Under the policy, areas of the vessel were designated for garbage collection, and different types of garbage were separated based on the appropriate disposal method.  *Id.* at 9.

Finally, the company maintained procedures for internal auditing of vessel compliance, which was conducted by the Health Safety and Environmental Quality Department of DSD and the Master and Chief Engineer of each vessel.  Exh. 9 [SEALED].  The shore-side Technical Superintendent was required to complete an annual audit of each vessel in the fleet and review aspects of the vessel, including Engine Room Operations.  Exhs. 9 [SEALED] & 10 [SEALED]. In addition, the Master and Chief Engineer were required to audit the vessel for compliance with Safety Management System policies and review Health, Safety and Environment Key Performance Indicators, including any non-compliance with international regulations.  *See* Exhs. 5 [SEALED] & 9 [SEALED].[4]

---

[4] Beyond company-mandated auditing and inspections, DSD vessels, including the *M/T Stavanger Blossom*, were often inspected by third parties to determine whether the vessel was seaworthy and in compliance with applicable laws and regulations.  These inspections included inspections by Port State Control in ports around the world, inspections by Lloyd's Register for the purpose of obtaining and maintaining the vessels International Oil Pollution

These existing compliance efforts are relevant to the sentencing of DSD.  As the U.S. Sentencing Guidelines recognize: "The prior diligence of an organization in seeking to prevent and detect criminal conduct has a direct bearing on the appropriate penalties and probation terms for the organization if it is convicted and sentenced for a criminal offense."  U.S. SENTENCING GUIDELINES § 8B2.1, cmt. 7, at 512 (2015).

> **b)**    ***DSD Voluntarily Improved Its Compliance Plan Prior to Conviction.***

Even before the trial in this matter, DSD, as a responsible corporate citizen, utilized the allegations raised in the indictments as "a lesson learned" and revised, strengthened, and improved its existing compliance programs accordingly.  For example, DSD outsourced technical management of vessels to Wallem GMBH & Co. KG ("Wallem").  *See* Exh. 3 (DSD AS 2014 Annual Report, at 3).  DSD hired Wallem to implement environmental and ethical compliance programs on most of DSD's vessels.  *See* Revised PSR ¶¶ 37, 44, at 11-13 [DE-266].  This has allowed DSD to draw upon Wallem's extensive experience in selecting and training seafarers.  In addition, Wallem specializes in maritime services, including the technical management of vessels in accordance with MARPOL, has experience implementing court-imposed Environmental Compliance Plans for vessel owners and operators, and has "a zero-tolerance policy toward" illegal conduct.  *Id.* ¶¶ 44, at 12-13.  Following the filing of the draft Presentence Investigation Report, DSD submitted materials to the Probation Office regarding the policies and procedures that Wallem has implemented on DSD-owned vessels, including MARPOL compliance and auditing procedures.  *See* Exhs. 11-16 [SEALED].

---

Prevention Certificates, and vetting inspections by companies wishing to utilize DSD vessels to transport cargo. DSD relied on these inspections as well as inspections by DSD employees to detect and report any deficiencies in the oil pollution prevention equipment.

As part of this program, Wallem has implemented a Safety, Health, Environmental and Quality Policy that establishes goals for operations, including to "conserve the environment." Exh. 11 [SEALED].  It also establishes the means to accomplish those goals by "emphasizing every employee's responsibility towards environmental preservation," by recognizing "that overall responsibility for Health, Safety and Environmental protection rests with the highest level of Wallem's management ashore and on board vessels," and by providing training so that employees have the skills necessary for the job.  *Id.*

Wallem has implemented policies and procedures that track these standards.  As an initial matter, prior to serving on any vessel managed by Wallem, employees must sign a document acknowledging their understanding of their obligations to protect the environment.  Exh. 12 [SEALED].  This includes a notification to employees of Wallem's zero-tolerance policy for illegal overboard discharges and a requirement that employees promptly report any violations to the Designated Person Ashore.  Exh. 12 [SEALED].

Wallem also ensures that vessels are audited on a regular basis by both a shore-side technical superintendent and the Master and Chief Engineers aboard its vessels.  *See* Exhs. 13 [SEALED] & 14 [SEALED].  Twice yearly, the technical superintendent reviews the vessel and looks at a number of issues, including the OWS, whether the record books match the rates and historical records kept by the OWS, the seals on overboard discharge valves, and whether there are any pipes that could be used to bypass the OWS.  Exh. 14 [SEALED].  An audit that identifies a problem is sent to both the Fleet Manager and the Designated Person Ashore to increase accountability and oversight for follow-up actions.  *Id.*  In addition, Masters and Chief Engineers joining the vessel must complete audits of the vessel within 15 days of joining.  Exh. 13, at  6, 9-10 [SEALED].  These audits require specific methods to detect MARPOL non-

compliance, including checking seals on discharge valves and opening the pipes connected to the OWS to inspect for oil inside. *Id.* at 10.

Beyond these auditing requirements, Wallem maintains eight training centers around the world to provide training, including training on MARPOL compliance to crewmembers. The MARPOL Compliance training is provided in person to allow for more greater interaction with instructors and permits questions by students. This training covers all of the annexes of MARPOL. Exh. 15 [SEALED]. In addition, when a new employee is hired by Wallem, Wallem's human resource employees walk these new hires through applicable policies, including the Code of Conduct and the Group Whistleblowing Policy. Exhs. 16 [SEALED] & 17 [SEALED]. Wallem's Code of Conduct again specifies a zero-tolerance policy for misconduct, including the entry of false information into Oil and Garbage Record Books. Exh. 16 [SEALED].

In addition, DSD replaced the OWS on board the *M/T Stavanger Blossom* in December 2014. *See* Revised PSR ¶ 12 n.1, at 7 [DE-266]. Although DSD had the option simply to repair the OWS, and even though the defect in the OWS—corrosion to a diaphragm within the OWS— "would not have prevented the vessel from departing the Port of Mobile," DSD "elected to replace the OWS in its entirety." *Id.* In addition, the newly-installed OWS complies with Marine Environmental Protection Committee Guideline (MEPC) 107(49), *see* Exh. 18, at 8, which, among other things, requires that the OWS keep a record of historical alarms, alarm when clean water is used in the Oil Content Monitor, and automatically stop overboard discharges when the oil content is greater than 15 ppm, *id*. This change in the OWS model makes detection of illegal conduct easier for both the company and the government. Notably, each of the vessels

operated by DSD Shipping utilize an MEPC 107(49) compliant OWS.  Revised PSR ¶ 45, at 13 [DE-266].

DSD also has no intention to reemploy any of the crew members involved in the instant offense, and the shore-side employee who received an e-mail copy of January 2010 hand-over memorandum is no longer employed by DSD in a superintendent capacity.  Revised PSR ¶ 45, at 13 [DE-266].  In addition, through Wallem, DSD has ensured that new members of its crew will receive MARPOL compliance training.  *Id.* ¶ 44, at 12-13.

Finally, DSD has voluntarily agreed to a court-approved environmental compliance plan and a court-appointed monitor to oversee its compliance and ethics program during the course of any term of probation imposed by the Court.  On March 4, 2016, DSD submitted a list of three potential monitors to the government for its review—namely, Capt. Kevin Coyne, Polaris Marine Partners, LLC; Capt. Richard Wigger, Compliance Systems, Inc., and Mr. Michael Minogue, ECM Maritime Services, LLC.  *See* Exh. 19.  DSD is simply awaiting the views of the government, which, to date, has not responded with its position on these potential monitors.

DSD made these changes not because it was required to do so by law, but rather because doing so strengthened the environmental compliance procedures and policies on DSD vessels—a matter that was important to DSD and its parent company.  These voluntary changes should be taken into account when the court imposes sentencing in this case.  *See United States v. Pflum*, 556 F. Supp. 2d 1254, 1264 (D. Kan. 2008) (noting that the defendant's post-offense corrective actions, which included revising the corporation's operations to ensure compliance with all applicable laws, were critical mitigating factors in determining the appropriate sentence to impose); *see also* U.S. SENTENCING GUIDELINES § 8B2.1(b)(7), at 508 (2015) (explaining that, "[a]fter criminal conduct has been detected, the organization shall take reasonable steps to

- 21 -

respond appropriately to the criminal conduct and to prevent further similar criminal conduct, including making any necessary modifications to the organization's compliance and ethics program").

### 3. A Low-End Fine is "Sufficient, But Not Greater Than Necessary," to Promote the Relevant Goals of Sentencing.

As noted above, the Court also must ensure that any sentence that is imposed is "sufficient, but not greater than necessary," to reflect the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).  Those goals include sentencing:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

As noted above, the relevant offense conduct is serious:  Employees of DSD were convicted for making false entries in record books used to detect pollution while large vessels are at sea, and those same employees also obstructed an investigation by the U.S. Coast Guard. With the exception of Mr. Dancu, who entered into a plea agreement shortly before trial, DSD's employees maintained their innocence, and the company stood by them accordingly.  At the same time, DSD takes seriously the misconduct that the jury found these employees to have committed following trial.

To that end, DSD had in place compliance programs to detect and deter this behavior, and it voluntarily strengthened these programs without regard to the outcome at trial.  These

actions will help ensure that the relevant offense conduct was an aberration—and not reflective of DSD's history as an otherwise law-abiding company.

In addition, the publicity associated with the counts of conviction against the company, along with the long-period of pretrial confinement for the crewmember defendants, far away from their families, and the possibility of their incarceration, should serve as a sufficient deterrent for future violations by others—without the need for a significant fine imposed against DSD.  Indeed, as the Department of Justice has itself recognized:  "One of the most effective ways to combat"—and "deter[]"—"corporate misconduct is by seeking accountability from the individuals who perpetrated the wrongdoing."  Mem. from Sally Q. Yates, Deputy Att'y Gen., *Individual Accountability for Corporate Wrongdoing* at 1 (Sept. 9, 2015) (*available at* https://www.justice.gov/dag/file/769036/download).  This approach helps avoid potentially severe, collateral consequences to the innocent employees, investors, and owners of DSD.

In addition, a low-end fine amount is warranted here because, as discussed above, there was no evidence that DSD executives condoned, authorized, or approved the misconduct at issue here, and scant evidence of knowledge on the part of the company, along with conflicting reports on the proper functioning of the OWS.  This too is relevant in determining an appropriate sentence for the company—one that reflects the seriousness of the employees' misconduct, but at the same time, the absence of direct corporate involvement.  In this way, a low-end fine helps mitigate against the harshness imposed by the strict nature of vicarious corporate liability.

Finally, it is doubtful that DSD's vessels will be involved in further instances of misconduct, and thus, there is a diminished need to protect the public from future misconduct by the defendant.  DSD has implemented a robust compliance program; it has installed anti-pollution equipment that makes it easier to detect instances of illegal conduct; it has re-trained its

crew; and it has utilized the services of Wallem to ensure that there will not be a repeat of the events that occurred on the *M/T Stavanger Blossom*.  All of this supports the imposition of a low-end fine.

### 4.      A Low-End Fine of $300,000 Would Avoid Unwarranted Sentencing Disparities.

The courts have held that defendants with like circumstances should receive similar sentences, and that defendants with different circumstances should receive different sentences. *See Dorsey v. United States*, 132 S. Ct. 2321, 2333-34 (2012) (noting that one of the purposes of the Sentencing Reform Act was to avoid "disparate sentences"); *cf.* 28 U.S.C. § 991(b)(1)(B) (charging the U.S. Sentencing Commission with developing uniform guidelines, in part, to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct").

To assist the Court in determining an appropriate sentence for DSD, the company has prepared a table that summarizes APPS prosecutions for which DSD was able to verify sentencing data from 2004 to the present.  *See* Exh. 20.  The table summarizes relevant information from 83 cases and helps to establish two reasons why DSD's proposed fine amount of $300,000 is appropriate here.

*First*, slightly more than half of these case (42 out of 83) resulted in a total offense amount (a fine and any community service amount) of $1 million or less, and a significant number of those cases involved fines that were substantially below that amount—with fines as low as $100,000.  *See id.*  This suggests that, absent exceptional circumstances, a fine of $300,000 is within the heartland of what is appropriate for resolving cases involving similar instances of misconduct.

*Second*, the cases with high-end fines tend to involve either repeat offenders or instances of misconduct on multiple vessels.  Neither consideration is at issue here.

As discussed above, there are numerous factors in this case that weigh heavily in favor of a criminal fine that is substantially below the typical fine imposed in the APPS cases summarized in the attached table.  In this case, there was substantial mitigating evidence demonstrating that DSD has a long and extensive record of environmental compliance across its vessel fleet, and that this case was its first contact with the criminal justice system. Notwithstanding the testimony introduced at trial regarding misconduct aboard the *M/T Stavanger Blossom*, in all other aspects of its business operations, DSD is a responsible corporate citizen that values and invests significant resources in achieving environmental compliance and innovating toward environmental sustainability.

To be clear, DSD is not attempting to downplay or minimize the jury's findings, but for purposes of distinguishing DSD from companies that received high-end sentences, it is relevant that DSD undertook numerous proactive measures to strengthen the company's overall compliance program—actions that accurately reflect DSD's corporate character and culture as one which has consistently stressed environmental compliance in all of its operations.   In addition, it is equally relevant that DSD is a first-time offender, and that there was no evidence of direct corporate involvement in the charged misconduct.  All of these factors support a low-end fine of $300,000.

**B.      The Section 3572 Factors Also Support a Fine Significantly Below the Maximum.**

In addition to considering the factors set forth in 18 U.S.C. § 3553(a), which govern the sentencing of all defendants, this Court also is required to consider the factors set forth in 18 U.S.C. § 3572 before determining "whether to impose a fine, and the amount, time for payment,

and method of payment of a fine."  The specific factors are listed above and will not be repeated here.  *See infra* at 7-8.  In brief, however, the chief factors relevant here are: (i) the limited financial resources DSD has available to pay any fine imposed; (ii) the burden that the fine will impose upon innocent employees, investors, and owners of the company; (iii) the absence of any loss inflicted upon others, and thus, the absence of any need for restitution; (iv) the absence of any pecuniary gain from the offense conduct; and (v) the significant steps that DSD has taken to prevent a recurrence of the offense conduct.  *See* 18 U.S.C. § 3572(a)(1)-(5), (8).  As discussed further below, each of these factors militates in favor of a low-end fine of $300,000.

### 1.     DSD's Stature as a Small, Privately-Owned Company Supports a Low-End Fine.

DSD is not claiming that it has an inability to pay any fine that the Court might impose, but it is relevant that DSD is a small, privately-owned company.  For example, its revenue (not profit) is roughly $3.2 million annually.  *See* Revised PSR ¶ 47, at 13 [DE-266].  Particularly in light of the increased compliance costs that DSD has voluntarily shouldered, along with its financial commitment (through a security agreement) of $1.4 million to ensure the attendance of the witnesses that testified at trial, a low-end fine amount more appropriately reflects DSD's small corporate stature.  *See* Sentencing Tr. 44:4-7, *United States v. Diana Shipping Servs., S.A.*, No. 2:13-cr-0040 (E.D. Va. Dec. 18, 2013) [DE-151] (taking into consideration "the $678,000 plus that has been expended by the company so far in payments to maintain the crew member witnesses and the defendants pursuant to the agreement on security").

### 2.     A Low-End Fine Avoids Collateral Consequences to Innocent Third-Parties.

The Court also should consider the potential harm that a sentence may impose on the innocent employees, investors, and owners of DSD.  *See* U.S. SENTENCING GUIDELINES § 8C2.5, cmt. n. 4, at 523 (2015) (directing courts to take into account the pervasiveness of the criminal

conduct); *cf.* U.S. ATTORNEYS' MANUAL § 9-28.1100 (noting that, in deciding whether to charge a company, prosecutors should bear in mind that a corporate "conviction may produce a result that seriously harms innocent third parties who played no role in the criminal conduct").  Here, there are hundreds of innocent employees, investors, and owners—individuals who had no hand in the offense conduct—that could be adversely affected by a significant fine amount.

### 3.     There is No Identifiable Victim, and Therefore, Restitution is Inapplicable Here.

As the Probation Office correctly found, "there is no identifiable victim" at issue here. Revised PSR ¶ 30, at 10 [DE-266].  As a result, the Office correctly recognized that "[r]estitution is not applicable in this case." *Id.* ¶ 51, at 14.

### 4.     DSD Did Not Derive Any Pecuniary Gain from the Conduct in Question.

It is also notable that DSD did not derive any pecuniary gain from the offense conduct. To be sure, a jury found that the crewmember defendants were acting, in part, with the intent to benefit DSD when they committed the offense conduct.  But the government did not submit any evidence that DSD derived a financial benefit from that conduct.  For that reason, the Probation Office did not identify any pecuniary gain that DSD might have derived from the offense conduct, and as a result, there is no need for the fine to disgorge ill-gotten profits.  *Cf.* U.S. SENTENCING GUIDELINES § 8C2.9, at 528 (2015) (providing that the Court shall use a fine to disgorge "any gain to the organization from the offense that has not and will not be paid as restitution or by way of other remedial measures").

### 5.     DSD Has Taken Meaningful Steps to Prevent A Recurrence of the Offense Conduct.

As explained above, DSD has taken meaningful steps to prevent a recurrence of the offense conduct.  It has agreed to a court-appointed monitor.  It implemented a comprehensive

compliance and training program through its decision to outsource management of its vessels to Wallem. It voluntarily replaced the OWS on the *M/T Stavanger Blossom* and has verified that all of the OWS systems in its fleet are compliant with MEPC 107(49). And it has no intention of re-hiring any of the crewmembers involved in the offense conduct.

* * * * *

Collectively, these factors all suggest that a fine of $300,000 is sufficient, but not greater than necessary, to serve the purposes of sentencing. It balances the seriousness of the offense conduct with the reality that DSD is a responsible corporate entity committed to ensuring that nothing similar ever happens again on one of its vessel.

## III. A Two-Year Term of Probation is Appropriate to Ensure that DSD Fully Implements Its Strengthened Compliance Program.

Based on the reasons discussed above, DSD respectfully submits that a two-year term of probation is reasonable and appropriate under the circumstances of this case. In addition, as noted above, DSD has agreed to a court-appointed monitor to oversee DSD's compliance efforts during any term of probation.

As is customarily done in these cases, the Probation Office informed DSD that it intends to recommend that the court impose an Environmental Compliance Plan. DSD is prepared to accept and implement such a plan with the assistance of Wallem. To that end, company representatives met with the Probation Office to determine the elements that would be requested for such a plan. DSD has attached a proposed Environmental Compliance Plan that takes into consideration the probation officer's suggestions and the remedial measures that DSD has already undertaken. Exh. 21.

DSD has proposed candidates for a court-appointed monitor to the government in the interest of moving forward with the implementation of an Environmental Compliance Plan. Exh.

19.   As noted above, DSD is simply waiting to hear back from the government regarding a proposed list of candidates.

## IV.      Comments to the Revised Presentence Investigation Report

DSD has worked with the Probation Office in an attempt to resolve the issues that it had with the Office's initial draft report.  The Revised report reflects the Probation Office's careful consideration of many of these issues.

## CONCLUSION

For the foregoing reasons, DSD respectfully requests that the Court impose a fine of no more than $300,000, a two-year term of probation, and the mandatory assessment of $2400 (after vacating the two counts of conviction that are multiplicitous of two other counts of conviction). In addition, DSD respectfully requests that the Court incorporate DSD's proposed Environmental Compliance Plan as a term and condition of probation, and appoint a jointly-nominated court-appointed monitor to conduct vessel audits and provide periodic audit reports to the parties, the Department of Probation, and the United States Coast Guard.

Dated: March 24, 2016                                       Respectfully submitted,

                                                            /s/ Steven P. Solow
                                                            _____
Thomas N. Kiehnhoff (admitted *pro hac vice*)               Steven P. Solow (admitted *pro hac vice*)
Katten Muchin Rosenman LLP                                  Robert T. Smith (admitted *pro hac vice*)
1301 McKinney Street, Suite 3000                            Katten Muchin Rosenman LLP
Houston, TX  77010-3033                                     2900 K Street, N.W.
(713) 270-3402                                              Washington, D.C.  20007-5118
(713) 583-2639 (Fax)                                        (202) 625-3616
tom.kiehnhoff@kattenlaw.com                                 (202) 339-6059 (Fax)
                                                            steve.solow@kattenlaw.com
William E. Scully, Jr. (sculw3127)                          robert.smith1@kattenlaw.com
Scully & Scully, P.C.
P.O. Box 962                                                *Counsel for the Defendant DSD Shipping AS*
Daphne, Alabama 36526-0962
(251) 626-5052
(251) 626-5051 (Fax)
wscully@scully-law.com

## CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this instrument via the Southern District's CM/ECF system on this the 24th day of March, 2016.

    Michael D. Anderson
    Assistant United States Attorney

                /s/ William E. Scully, Jr.
                William E. Scully, Jr.